IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| SOVEREIGN PEAK VENTURES, LLC, | § § § | |
| Plaintiff, | § § | |
| v. | § § § | CIVIL ACTION NO. 1:26-cv-1269 |
| | § § | |
| BYTEDANCE LTD., BYTEDANCE PTE. LTD., BYTEDANCE INC., BYTEDANCE TECHNOLOGY LTD., TIKTOK LTD., TIKTOK PTE. LTD., TIKTOK INC., BYTEPLUS PTE. LTD., AND PICO IMMERSIVE PTE. LTD., | § § § § § § § § § | **JURY TRIAL DEMANDED** |
| Defendants. | § § | |

**PLAINTIFF SOVEREIGN PEAK VENTURES, LLC'S
ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT**

1.     Plaintiff Sovereign Peak Ventures, LLC ("Plaintiff" or "SPV") files this Original Complaint against Defendants ByteDance Ltd.; ByteDance Pte. Ltd.; ByteDance Inc.; ByteDance Technology Ltd.; TikTok Ltd.; TikTok Pte. Ltd.; TikTok Inc.; BytePlus Pte. Ltd.; and Pico Immersive Pte. Ltd. (collectively, "Defendants" or "ByteDance") for infringement of U.S. Patent No. 6,925,097 (the "'097 Patent"); U.S. Patent No. 8,019,169 (the "'169 Patent"); U.S. Patent No. 8,737,476 (the "'476 Patent"); U.S. Patent No. 8,971,401 (the "'401 Patent"); U.S. Patent No. 9,414,059 (the "'059 Patent"); U.S. Patent No. 8,902,871 (the "'871 Patent"); U.S. Patent No. 9,357,441 (the "'441 Patent"); U.S. Patent No. 10,039,144 (the "'144 Patent"); U.S. Patent No. 11,672,028 (the "'028 Patent"); and U.S. Patent No. 12,225,599 (the "'599 Patent"), collectively, the "Asserted Patents."

PLAINTIFF'S ORIGINAL COMPLAINT                    1

## THE PARTIES

2.     Plaintiff SPV is a Texas Limited Liability Company with its principal place of business located at 812 West McDermott Drive, Suite 1069, Allen, Texas 75013.

3.     On information and belief, Defendant ByteDance Ltd. is a foreign corporation organized under the laws of the Cayman Islands with a principal place of business at P.O. Box 31119, Grand Pavilion, Hibiscus Way, 802 West Bay Road, Grand Cayman, KY1-1205, Cayman Islands.

4.     On information and belief, Defendant ByteDance Pte. Ltd. is a foreign corporation organized under the laws of Singapore with a principal place of business at 1 Raffles Quay, #26-10, Singapore, 048583.

5.     On information and belief, ByteDance Inc. is a corporation organized under the laws of Delaware with a principal place of business at 250 Bryant Street, Mountain View, California 94041. On information and belief, Defendant ByteDance Inc. maintains an office at 300 Colorado Street, Austin, Texas 78701.[1] On information and belief, Defendant ByteDance Inc. has an active registration for a Texas Franchise Tax Account, which provides it the right to transact business in Texas. On further information and belief, Defendant ByteDance Inc.'s registered agent for service of process in the State of Texas is the Corporation Service Company d/b/a CSC-Lawyers Incorporating Service Company, 211 East 7th Street, Suite 620, Austin, Texas 78701.

---

[1] Indeed, ByteDance Inc. has hired employees to work at this location. *See* https://h1bgra der.com/h1b-sponsors/bytedance-inc-m2m6jrj401/lca/2025/lca-details/I-200-25027-645559.

PLAINTIFF'S ORIGINAL COMPLAINT                    2



Source: https://joinbytedance.com/locations

6.      On information and belief, ByteDance Technology Ltd. is a foreign corporation organized under the laws of the Cayman Islands with a principal place of business at P.O. Box 31119, Grand Pavilion, Hibiscus Way, 802 West Bay Road, Grand Cayman, KY1-1205, Cayman Islands.

7.      On information and belief, Defendant TikTok Ltd. is a foreign corporation organized under the laws of the Cayman Islands with a principal place of business at P.O. Box 31119, Grand Pavilion, Hibiscus Way, 802 West Bay Road, Grand Cayman, KY1-1205, Cayman Islands.

8.      On information and belief, Defendant TikTok Pte. Ltd. is a foreign corporation organized under the laws of Singapore with a principal place of business at 1 Raffles Quay, #26-10, Singapore, 048583.

9.      On information and belief, Defendant TikTok Inc. is a California corporation with its headquarters at 5800 Bristol Parkway, Suite 100, Culver City, CA 90230 and an office at 300

PLAINTIFF'S ORIGINAL COMPLAINT            3

Colorado Street, Austin, Texas 78701. On information and belief, Defendant TikTok Inc. has an active registration for a Texas Franchise Tax Account, which provides it the right to transact business in Texas. On further information and belief, Defendant TikTok Inc.'s registered agent for service of process in the State of Texas is the Corporation Service Company d/b/a CSC-Lawyers Incorporating Service Company, 211 East 7th Street, Suite 620, Austin, Texas 78701.



Source: https://lifeattiktok.com/locations

10.     On information and belief, Defendant BytePlus Pte. Ltd. is a foreign corporation organized under the laws of Singapore with a principal place of business at 1 Raffles Quay, #26-10, Singapore, 048583.

11.     On information and belief, Defendant Pico Immersive Pte. Ltd. is a foreign corporation organized under the laws of Singapore with a principal place of business at 1 Raffles Quay, #26-10, Singapore, 048583.

12.     On information and belief, Defendant ByteDance Ltd. is the ultimate parent company of Defendants ByteDance Pte. Ltd.; ByteDance Inc.; ByteDance Technology Ltd.; TikTok Ltd.; TikTok Pte. Ltd.; TikTok Inc.; BytePlus Pte. Ltd.; and Pico Immersive Pte. Ltd.

**JURISDICTION AND VENUE**

13.     This action arises under the patent laws of the United States, namely 35 U.S.C. §§ 271, 281, and 284-285, among others.

14.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a).

15.     This Court has specific and general personal jurisdiction over ByteDance consistent with the requirements of the Due Process Clause of the United States Constitution and the Texas Long Arm Statute because, inter alia, (i) ByteDance has engaged in continuous, systematic, and substantial business in Texas; and (ii) ByteDance has committed and continues to commit, acts of patent infringement in this State and in this District. Such acts of infringement include the making, using, testing, offering for sale, and selling of the HEVC Accused Products and Wi-Fi Direct Accused Products (as more particularly identified and described throughout this Original Complaint, below) that leverage and infringe the inventions of the Asserted Patents in this State and this District and/or inducing others to commit acts of patent infringement in this State and District.

16.     On information and belief, ByteDance has purposefully and voluntarily placed, and is continuing to place, one or more HEVC Accused Products and Wi-Fi Direct Accused Products into the stream of commerce through established distribution channels (including the Internet) with the knowledge and intent that the HEVC Accused Products and Wi-Fi Direct Accused Products are and/or will be used, sold to, and purchased by consumers in the United States, this State, and this District; and with the knowledge and expectation that the HEVC Accused Products and Wi-Fi Direct Accused Products (whether in standalone form or as integrated in downstream products) will be imported into the United States, this State, and this District.

17.    In addition, ByteDance has derived substantial revenues from its infringing acts occurring within this State and this District. It has substantial business in this State and this District, including: (i) at least part of its infringing activities alleged herein; and (ii) regularly doing or soliciting business, engaging in other persistent conduct, and/or deriving substantial revenue from infringing goods offered for sale, sold, and imported, and services provided to Texas residents. ByteDance derives benefits from its presence in this District.

18.    In addition, ByteDance has knowingly induced, and continues to knowingly induce, infringements within this State and this District by advertising, marketing, offering for sale and/or selling the HEVC Accused Products and Wi-Fi Direct Accused Products (as more particularly identified and described throughout this Original Complaint) that incorporate the fundamental technologies covered by the Asserted Patents. Such advertising, marketing, offering for sale and/or selling of Accused Products is directed to consumers, customers, integrators, suppliers, distributors, resellers, partners, and/or end users, and this includes providing instructions, user manuals, advertising, and/or marketing materials that facilitate, direct, and encourage use of infringing functionality with ByteDance's knowledge thereof.

19.    ByteDance has, thus, in the many ways described above, availed itself of the benefits and privileges of conducting business in this State and willingly subjected itself to the exercise of this Court's personal jurisdiction over it. Indeed, ByteDance has sufficient minimum contacts with this forum through its transaction of substantial business in this State and this District and its commission of acts of patent infringement as alleged in this Original Complaint that are purposefully directed towards this State and District.

20.    Venue is proper under 28 U.S.C. § 1391 and 28 U.S.C. § 1400(b). Foreign Defendants ByteDance Ltd., ByteDance Pte. Ltd., ByteDance Technology Ltd., TikTok Ltd.,

TikTok Pte. Ltd., BytePlus Pte. Ltd., and Pico Immersive Pte. Ltd. do not reside in the United States, and thus venue is appropriate in this District under 28 U.S.C. § 1391(c)(3). In addition to the facts set forth above, Defendants TikTok Inc. and ByteDance Inc. have committed acts of infringement in this District and have a regular and established place of business in this District at least through regularly conducting business at their offices located in this District in Austin, Texas, the millions of users of the HEVC Accused Products and Wi-Fi Direct Accused Products (as more particularly identified and described throughout this Original Complaint) within the State of Texas, many of whom reside in this District, as well as maintaining active registrations for Texas Franchise Tax Accounts.

## BYTEDANCE'S PRE-SUIT KNOWLEDGE OF ITS INFRINGEMENTS

21.    Prior to the filing of this Original Complaint, Plaintiff attempted to engage ByteDance and/or its agents in good faith licensing discussions related to the Asserted Patents, including by sending them correspondence on July 1, 2025, notifying ByteDance of the need to license the Asserted Patents. Plaintiff's correspondence was delivered to ByteDance on July 3, 2026.

22.    Claim charts for the '097, '169, '476, '401, and '059 Patents (collectively, the "HEVC Asserted Patents") identifying exemplary infringed claims and exemplary infringing ByteDance products and services were made available for download in a private data room on September 17, 2025.

23.    Claim charts for the '871, '441, '144, '028, and '599 Patents (collectively, the "Wi-Fi Direct Asserted Patents") identifying exemplary infringed claims and exemplary infringing ByteDance products and services were made available for download in a private data room on October 16, 2025.

24.     The HEVC Accused Products and Wi-Fi Direct Accused Products (as more particularly identified and described throughout this Original Complaint) addressed in the Counts below include, but are not limited to, products and services identified in at least Plaintiff's exemplary claim charts. ByteDance's past and continuing sales of the HEVC Accused Products and Wi-Fi Direct Accused Products (i) willfully infringe the Asserted Patents and (ii) impermissibly usurp the significant benefits of Plaintiff's patented technologies without fair compensation.

## THE ASSERTED PATENTS AND TECHNOLOGY

25.     Plaintiff is the sole and exclusive owner of all right, title, and interest in the Asserted Patents and holds the exclusive right to take all actions necessary to enforce its rights in, and to, the Asserted Patents, including the filing of this patent infringement lawsuit. Indeed, Plaintiff also has the right to recover all damages for past, present, and future infringements of the Asserted Patents and to seek injunctive relief as appropriate under the law.

26.     The '097 Patent is entitled "Decoder, decoding method, multiplexer, and multiplexing method." The '097 Patent lawfully issued on August 2, 2005, and stems from U.S. Patent Application No. 09/820,311, which was filed on March 29, 2001. A copy of the '097 Patent is attached hereto as Ex. A.

27.     The '169 Patent is entitled "Image coding apparatus, image decoding apparatus, image processing apparatus and methods thereof." The '169 Patent lawfully issued on September 13, 2011, and stems from U.S. Patent Application No. 12/014,895, which was filed on January 16, 2008. A copy of the '169 Patent is attached hereto as Ex. B.

28.     The '476 Patent is entitled "Image decoding device, image decoding method, integrated circuit, and program for performing parallel decoding of coded image data." The '476

Patent lawfully issued on May 27, 2014, and stems from International Patent Application No. PCT/JP2009/005476, which was filed on October 20, 2009. A copy of the '476 Patent is attached hereto as Ex. C.

29.    The '401 Patent is entitled "Image decoding device." The '401 Patent lawfully issued on March 3, 2015, and stems from U.S. Patent Application No. 13/246,503, which was filed on September 27, 2011. A copy of the '401 Patent is attached hereto as Ex. D.

30.    The '059 Patent is entitled "Image processing device, image coding method, and image processing method." The '059 Patent lawfully issued on August 9, 2016, and stems from International Patent Application No. PCT/JP2011/005575, which was filed on October 3, 2011. A copy of the '059 Patent is attached hereto as Ex. E.

31.    The '871 Patent is entitled "Wireless base station and wireless communication terminal and wireless communication system." The '871 Patent lawfully issued on December 2, 2014, and stems from U.S. Patent Application No. 13/607,931, which was filed on September 10, 2012. A copy of the '871 Patent is attached hereto as Ex. F.

32.    The '441 Patent is entitled "Wireless base station and wireless communication terminal and wireless communication system." The '441 Patent lawfully issued on May 31, 2016, and stems from U.S. Patent Application No. 14/747,164, which was filed on June 23, 2015. A copy of the '441 Patent is attached hereto as Ex. G.

33.    The '144 Patent is entitled "Wireless base station and wireless communication terminal and wireless communication system." The '144 Patent lawfully issued on July 31, 2018, and stems from U.S. Patent Application No. 15/142,258, which was filed on April 29, 2016. A copy of the '144 Patent is attached hereto as Ex. H.

34.     The '028 Patent is entitled "Wireless base station and wireless communication terminal and wireless communication system." The '028 Patent lawfully issued on June 6, 2023, and stems from U.S. Patent Application No. 16/786,582, which was filed on February 10, 2020. A copy of the '028 Patent is attached hereto as Ex. I.

35.     The '599 Patent is entitled "Wireless base station and wireless communication terminal and wireless communication system." The '599 Patent lawfully issued on February 11, 2025, and stems from U.S. Application No. 18/190,820, which was filed on March 27, 2023. A copy of the '599 Patent is attached hereto as Ex. J.

36.     The claims of the Asserted Patents are directed to patent-eligible subject matter under 35 U.S.C. § 101. The claims are not directed to an abstract idea and instead are directed to specific technological systems and methods, including ordered combinations of features, functions, and steps that, at the time of invention, were not, alone or in combination, well-understood, routine, or conventional.

37.     To the extent necessary, Plaintiff has complied with the requirements of 35 U.S.C. § 287, such that Plaintiff may recover pre-suit damages.

**THE BYTEDANCE ACCUSED PRODUCTS**

38.     ByteDance has made, used, sold, offered for sale, and/or imported certain ByteDance products, their components and processes, including software and application integration systems that incorporate the fundamental technologies covered by the HEVC Asserted Patents and/or practiced the subject matter claimed by the HEVC Asserted Patents including, but not limited to, (i) TikTok; (ii) CapCut; (iii) BytePlus Torch Object Storage; (iv) BytePlus RTC; (v) BytePlus Video on Demand; and (vi) BytePlus MediaLive, together with all variations, versions, and adaptations thereof, and all other systems, services, processes, methods, acts,

components (hardware and/or software), and/or other instrumentalities with functionality similar to that identified in Counts I-V recited below released within the relevant timeframe set forth in 35 U.S.C. § 286 (collectively, the "HEVC Accused Products").

39.    The H.265 Standard was "developed in response to the growing need for higher compression of moving pictures for various applications such as videoconferencing, digital storage media, television broadcasting, internet streaming, and communications."[2]

40.    Each of the HEVC Accused Products decode video according to the H.265 Standard and encode video into H.265-compliant formats.



Source: https://developers.tiktok.com/doc/content-po
sting-api-media-transfer-guide (emphasis added)



Source: https://www.capcut.com/resource/what-is-a-bitrate-in-video (emphasis added)

---

[2] https://www.itu.int/rec/T-REC-H.265/en, at 1.

PLAINTIFF'S ORIGINAL COMPLAINT                11



Source: https://docs.byteplus.com/en/docs/tos/docs-overview_7 (emphasis added)



Source: https://docs.byteplus.com/en/docs/byteplus-rtc/d
ocs-104481#screenencoderconfig (emphasis added)



Source: https://docs.byteplus.com/en/docs/byteplus-rtc/d
ocs-104481#screenencoderconfig (emphasis added)



PLAINTIFF'S ORIGINAL COMPLAINT          12

Source: https://docs.byteplus.com/en/docs/byteplus-rtc/docs-66812 (emphasis added)



Source: https://docs.byteplus.com/en/docs/byteplus-vod/reference-getplayinfo (emphasis added)



Source: https://docs.byteplus.com/en/docs/byteplus-vod/docs-limits (emphasis added)



Source: https://docs.byteplus.com/en/docs/byteplus-me
dia-live/docs-product-overview (emphasis added)

41.    ByteDance has made, used, sold, offered for sale, and/or imported certain ByteDance products, their components and processes, including software and application integration systems that incorporate the fundamental technologies covered by the Wi-Fi Direct Asserted Patents and/or practiced the subject matter claimed by the Wi-Fi Direct Asserted Patents including, but not limited to, (i) Pico 4; (ii) Pico G2 4K; (iii) Pico Neo2; and (iv) Pico Neo3, together with all variations, versions, and adaptations thereof, and all other systems, services, processes, methods, acts, components (hardware and/or software), and/or other instrumentalities with functionality similar to that identified in Counts VI-X recited below released within the relevant timeframe set forth in 35 U.S.C. § 286 (collectively, the "Wi-Fi Direct Accused Products").

42.      Wi-Fi Direct was developed as a solution for Wi-Fi device-to-device connectivity.[3]

In Wi-Fi Direct, one Wi-Fi Direct peer acts as a wireless communication device and another Wi-Fi Direct peer acts as a wireless station. Wi-Fi Direct is utilized to connect these two peers.

43.      Each of the Wi-Fi Direct Accused Products support Miracast, which "builds upon Wi-Fi Direct with mechanisms to negotiate video capabilities, setup content prediction [], stream content, and maintain the video session."[4]

**Screencast to a Smart TV**

First, verify that your headset and smart TV share the same local network. Then, select either the Cast for PICO option or a screen mirroring app, such as Miracast, on your smart TV. Next, enter the PDC platform on your PICO 4 headset. Tap the "Connect" button beside the smart TV name listed on the right-hand side. Finally, the screencast should start.

Source: https://www.picoxr.com/global/blog/how-to-acti
vate-screencast-with-pico4 (emphasis added)

---

[3] Wi-Fi Peer-to-Peer (P2P) Technical Specification Version 1.7, at 13.
[4] https://www.wi-fi.org/faq/how-miracast-related-wi-fi-direct; *see* https://www.prnewswire.com/news-releases/easy-to-use-multi-vendor-wireless-display-has-arrived-wi-fi-alliance-launches-wi-fi-certified-miracast-170295746.html ("Miracast connections are formed using Wi-Fi CERTIFIED Wi-Fi Direct™, so access to a Wi-Fi® network is not needed – the ability to connect is inside Miracast-certified devices.").

PLAINTIFF'S ORIGINAL COMPLAINT                    15

## Streaming

One of the most important design decisions by Pico was to remove the built-in-display port. This means that the Pico 4 has no dedicated wired streaming as of the moment of writing. This means that SteamVR can only be accessed on the Pico 4 wirelessly. This leaves users with two options.

The first option is through using the virtual desktop application to wirelessly stream PC VR games.

The second option is through using the wireless dongle accessory for the Pico 4 that will allow you to connect it to the PC and with help with the Pico streaming assistant use it as a PC VR headset.

In terms of casting the Pico has a built in casting feature, which can easily connect to all miracast enabled devices. Miracast is not to be mixed with Chrome cast. However, miracast is found in almost all Smart TVs and devices that are not owned by Google.

Source: https://vrx.vr-expert.com/pico-4-review/ (emphasis added)

## 10 How to cast screen to a TV/TV box/laptop

To cast screen, please make sure your TV/TV box supports **Miracast**. To find Miracast compatible devices, please refer to Wi-Fi Alliance product finder: https://www.wi-fi.org/miracast-products

To project the VR headset to a laptop, you should ensure that the operating system is Windows 10 system and the network adapter supports **Miracast**.

Below is a way to help you ensure if the network adapter supports Miracast:

Source: https://sdk.picovr.com/docs/FAQ/chapter_ten.html (emphasis added)

PLAINTIFF'S ORIGINAL COMPLAINT                    16



G2 4K series/ Neo2 series

1. Find Miracast application on TV/TV box, and make sure the application to start scanning.

2. Double click "Home" button on headset to pop up shortcut panel.

3. Click the "Screencast" button.

4. Choose projection device from the list.

Source: https://sdk.picovr.com/docs/FAQ/chapter_ten.html (emphasis added)



Neo3 series

1. Find Miracast application on TV/TV box, and make sure the application to start scanning.

2. Pressing "Home" button to launch quick setting.

3. Click the "Screencast" button.

4. Click the"Screencast",  and select the"Use Miracast".

5. Click on the upper right corner to enable projection.

Source: https://sdk.picovr.com/docs/FAQ/chapter_ten.html (emphasis added)

44.    The technology discussion above and the exemplary Accused Products provide context for Plaintiff's infringement allegations contained herein.

## **COUNT I**

### (INFRINGEMENT OF U.S. PATENT NO. 6,925,097)

45.    Plaintiff incorporates the preceding paragraphs herein by reference.

46.    This cause of action arises under the patent laws of the United States, and, in particular, 35 U.S.C. §§ 271, *et seq*.

47.    Plaintiff is the owner of all substantial rights, title, and interest in and to the '097 Patent including the right to exclude others and to enforce, sue, and recover damages for past infringements.

48.    The '097 Patent is valid, enforceable, and was duly and legally issued by the United States Patent and Trademark Office on August 2, 2005, after full and fair examination.

49.    ByteDance has directly infringed one or more claims of the '097 Patent in this District and elsewhere in Texas and the United States by making, offering to sell, selling, testing, using, and/or importing ByteDance products, their components and processes, and/or products containing the same that incorporate the fundamental technologies covered by the '097 Patent, including, but not limited to, the HEVC Accused Products.

*Direct Infringement (35 U.S.C. § 271(a))*

50.    ByteDance has directly infringed one or more claims of the '097 Patent in this District and elsewhere in Texas and the United States.

51.     ByteDance has directly infringed, either by itself or via its agent(s), at least claim 4 of the '097 Patent[5] as set forth under 35 U.S.C. § 271(a) by making, offering to sell, selling, testing, and/or using the HEVC Accused Products.

52.     By way of illustration only, ByteDance, via the HEVC Accused Products, performs[6] each and every element of claim 4 of the '097 Patent. To the extent the preamble is limiting, the HEVC Accused Products perform "[a] decoding method for carrying out a decoding process for a multiplexed stream which is obtained by multiplexing plural streams in parallel for each of the streams included in the multiplexed stream." For example, each HEVC Accused Product supports HEVC (H.265), which describes the method by which each HEVC Accused Product decodes an image. More particularly, each HEVC Accused Product utilizes multi-level slice fragmentation. In one non-limiting example, each HEVC Accused Product decodes input image bitstream(s), where each bitstream (e.g., a multiplexed stream) is obtained by multiplexing a plurality of smaller units (e.g., slices or plural streams) that are configured to be processed in parallel during decoding.

---

[5] Throughout this Original Complaint, wherever Plaintiff identifies specific claims of the Asserted Patents infringed by ByteDance, Plaintiff expressly reserves the right to identify additional claims and products in its infringement contentions in accordance with applicable local rules and the Court's case management order. Specifically identified claims throughout this Original Complaint are provided for notice pleading only.

[6] For convenience, the allegations are expressed in the present tense. All statements are intended to apply to the HEVC Accused Products as they existed and operated during the relevant period, unless otherwise specified.

> **0.3   Purpose**
>
> This Recommendation | International Standard was developed in response to the growing need for higher compression of moving pictures for various applications such as videoconferencing, digital storage media, television broadcasting, internet streaming, and communications. It is also designed to enable the use of the coded video representation in a flexible manner for a wide variety of network environments as well as to enable the use of multi-core parallel encoding and decoding devices. The use of this Recommendation | International Standard allows motion video to be manipulated as a form of computer data and to be stored on various storage media, transmitted and received over existing and future networks and distributed on existing and future broadcasting channels. Supports for higher bit depths and enhanced chroma formats, including the use of full-resolution chroma are provided. Support for scalability enables video transmission on networks with varying transmission conditions and other scenarios involving multiple bit rate services. Support for multiview enables representation of video content with multiple camera views and optional auxiliary information. Support for 3D enables joint representation of video content and depth information with multiple camera views.

Source: https://www.itu.int/rec/T-REC-H.265/en (emphasis added)

> **8.1   General decoding process**
>
> **8.1.1   General**
>
> Input to this process is a bitstream. Output of this process is a list of decoded pictures.
>
> The decoding process is specified such that all decoders that conform to a specified profile, tier and level will produce numerically identical cropped decoded output pictures when invoking the decoding process associated with that profile for a bitstream conforming to that profile, tier and level. Any decoding process that produces identical cropped decoded output pictures to those produced by the process described herein (with the correct output order or output timing, as specified) conforms to the decoding process requirements of this Specification.
>
> > NOTE 1 – For the purpose of best-effort decoding, a decoder that conforms to a particular profile at a given tier and level can additionally decode some bitstreams conforming to a different tier, level or profile without necessarily using a decoding process that produces numerically identical cropped decoded output pictures to those produced by the process specified herein (without claiming conformance to the other profile, tier and level).
>
> At the beginning of decoding a coded video sequence group (CVSG), after activating the VPS RBSP that is active for the entire CVSG and activating the SPS referenced by the first coded picture in decoding order in the CVSG, and before decoding any VCL NAL units of the CVSG, clause 8.1.2 is invoked with the CVSG as input.

Source: https://www.itu.int/rec/T-REC-H.265/en (emphasis added)

> **6.3.1   Partitioning of pictures into slices, slice segments and tiles**
>
> This clause specifies how a picture is partitioned into slices, slice segments and tiles. Pictures are divided into slices and tiles. A slice is a sequence of one or more slice segments starting with an independent slice segment and containing all subsequent dependent slice segments (if any) that precede the next independent slice segment (if any) within the same picture. A slice segment is a sequence of CTUs. Likewise, a tile is a sequence of CTUs.
>
> For example, a picture may be divided into two slices as shown in Figure 6-4. In this example, the first slice is composed of an independent slice segment containing 4 CTUs, a dependent slice segment containing 32 CTUs and another dependent slice segment containing 24 CTUs; and the second slice consists of a single independent slice segment containing the remaining 39 CTUs of the picture.

Source: https://www.itu.int/rec/T-REC-H.265/en (emphasis added)



Figure 6-4 – A picture with 11 by 9 luma CTBs that is partitioned into two slices, the first of which is partitioned into three slice segments (informative)

Source: https://www.itu.int/rec/T-REC-H.265/en (emphasis added)



Figure 6-5 – A picture with 11 by 9 luma CTBs that is partitioned into two tiles and one slice (left) or is partitioned into two tiles and three slices (right) (informative)

Source: https://www.itu.int/rec/T-REC-H.265/en (emphasis added)

53.    The HEVC Accused Products separate "the multiplexed stream into plural streams." For example, each HEVC Accused Product divides an encoded input bitstream into multiple slices. Each slice may be further divided into slice segments.



**Figure 6-4 – A picture with 11 by 9 luma CTBs that is partitioned into two slices, the first of which is partitioned into three slice segments (informative)**

Source: https://www.itu.int/rec/T-REC-H.265/en (emphasis added)



**Figure 6-5 – A picture with 11 by 9 luma CTBs that is partitioned into two tiles and one slice (left) or is partitioned into two tiles and three slices (right) (informative)**

Source: https://www.itu.int/rec/T-REC-H.265/en (emphasis added)

**7.3.6    Slice segment header syntax**

**7.3.6.1    General slice segment header syntax**

| slice_segment_header( ) { | Descriptor |
|---|---|
| **first_slice_segment_in_pic_flag** | u(1) |
| if( nal_unit_type >= BLA_W_LP && nal_unit_type <= RSV_IRAP_VCL23 ) | |
| **no_output_of_prior_pics_flag** | u(1) |
| **slice_pic_parameter_set_id** | ue(v) |
| if( !first_slice_segment_in_pic_flag ) { | |
| if( dependent_slice_segments_enabled_flag ) | |
| **dependent_slice_segment_flag** | u(1) |
| **slice_segment_address** | u(v) |
| } | |

Source: https://www.itu.int/rec/T-REC-H.265/en (emphasis added)

**6.3.3    Spatial or component-wise partitionings**

The following divisions of processing elements of this Specification form spatial or component-wise partitionings:

‒ The division of each picture into components
‒ The division of each component into CTBs
‒ The division of each picture into tile columns
‒ The division of each picture into tile rows
‒ The division of each tile column into tiles
‒ The division of each tile row into tiles
‒ The division of each tile into CTUs
‒ The division of each picture into slices
‒ The division of each slice into slice segments
‒ The division of each slice segment into CTUs
‒ The division of each CTU into CTBs

Source: https://www.itu.int/rec/T-REC-H.265/en (emphasis added)

54.    The HEVC Accused Products select "one of the plural separated streams such that a target of a decoding process is converted from one stream to another stream." The HEVC Accused Products decode each of the slices in an input bitstream one by one. For example, as demonstrated below, each HEVC Accused Product executes the *do while* loop until all slice segments within a slice are decoded, which ensures that the entire slice is decoded before moving to the subsequent slice.



**7.3.8        Slice segment data syntax**

**7.3.8.1      General slice segment data syntax**

| slice_segment_data( ) { | Descriptor |
|---|---|
| do { | |
| coding_tree_unit( ) | |
| **end_of_slice_segment_flag** | ae(v) |
| CtbAddrInTs++ | |
| CtbAddrInRs = CtbAddrTsToRs[ CtbAddrInTs ] | |
| if( !end_of_slice_segment_flag && <br>     ( ( tiles_enabled_flag && TileId[ CtbAddrInTs ] != TileId[ CtbAddrInTs − 1 ] ) \|\| <br>     ( entropy_coding_sync_enabled_flag && <br>       ( CtbAddrInRs % PicWidthInCtbsY == 0 \|\| <br>         TileId[ CtbAddrInTs ] != TileId[ CtbAddrRsToTs[ CtbAddrInRs − 1 ] ] ) ) ) <br>   ) { | |
| **end_of_subset_one_bit** /* equal to 1 */ | ae(v) |
| byte_alignment( ) | |
| } | |
| } while( !end_of_slice_segment_flag ) | |
| } | |

Source: https://www.itu.int/rec/T-REC-H.265/en (emphasis added)

In one non-limiting example illustrated below, Slice 1 is selected for decoding first, followed by Slice 2 thereby switching the decoding order from Slice 1 to Slice 2.



Source: https://www.itu.int/rec/T-REC-H.265/en (emphasis added)

55.        The HEVC Accused Products decode "one of the plural separated streams output by the stream selection process." For example, each HEVC Accused Product decodes the slice that was selected by the stream selection process.



Source: https://www.itu.int/rec/T-REC-H.265/en (emphasis added)

### 7.3.8　　Slice segment data syntax

### 7.3.8.1　　General slice segment data syntax

| slice_segment_data( ) { | Descriptor |
|---|---|
| do { | |
| coding_tree_unit( ) | |
| **end_of_slice_segment_flag** | ae(v) |
| CtbAddrInTs++ | |
| CtbAddrInRs = CtbAddrTsToRs[ CtbAddrInTs ] | |
| if( !end_of_slice_segment_flag && <br> ( ( tiles_enabled_flag && TileId[ CtbAddrInTs ] != TileId[ CtbAddrInTs − 1 ] ) \|\| <br> ( entropy_coding_sync_enabled_flag && <br> ( CtbAddrInRs % PicWidthInCtbsY  == 0 \|\| <br> TileId[ CtbAddrInTs ] != TileId[ CtbAddrRsToTs[ CtbAddrInRs − 1 ] ] ) ) ) <br> ) { | |
| **end_of_subset_one_bit** /* equal to 1 */ | ae(v) |
| byte_alignment( ) | |
| } | |
| } while( !end_of_slice_segment_flag ) | |
| } | |

Source: https://www.itu.int/rec/T-REC-H.265/en (emphasis added)

### 7.4.9.1　　General slice segment data semantics

**end_of_slice_segment_flag** equal to 0 specifies that another CTU is following in the slice. end_of_slice_segment_flag equal to 1 specifies the end of the slice segment, i.e., that no further CTU follows in the slice segment.

Source: https://www.itu.int/rec/T-REC-H.265/en (emphasis added)

56.     The HEVC Accused Products detect "a stream switchable position in a stream being subjected to said decoding, at which position said decoding can be interrupted" and perform "said selecting such that said decoding for the stream which is being processed is interrupted at the stream switchable position." For example, each HEVC Accused Product detects the end of a slice (or, more specifically, the end of the last slice segment within a slice) where decoding of the slice stops. As demonstrated below, each of the HEVC Accused Products execute the *do while* loop which ends when *end_of_slice_segment_flag* equals 1.



Source: https://www.itu.int/rec/T-REC-H.265/en (emphasis added)

### 7.3.8    Slice segment data syntax

### 7.3.8.1    General slice segment data syntax

| slice_segment_data( ) { | Descriptor |
|---|---|
|   do { | |
|     coding_tree_unit( ) | |
|     **end_of_slice_segment_flag** | ae(v) |
|     CtbAddrInTs++ | |
|     CtbAddrInRs = CtbAddrTsToRs[ CtbAddrInTs ] | |
|     if( !end_of_slice_segment_flag &&<br>      ( ( tiles_enabled_flag && TileId[ CtbAddrInTs ] != TileId[ CtbAddrInTs − 1 ] ) ||<br>      ( entropy_coding_sync_enabled_flag &&<br>        ( CtbAddrInRs % PicWidthInCtbsY == 0 ||<br>          TileId[ CtbAddrInTs ] != TileId[ CtbAddrRsToTs[ CtbAddrInRs − 1 ] ] ) ) ) )<br>    ) { | |
|       **end_of_subset_one_bit** /* equal to 1 */ | ae(v) |
|       byte_alignment( ) | |
|     } | |
|   } while( !end_of_slice_segment_flag ) | |
| } | |

Source: https://www.itu.int/rec/T-REC-H.265/en (emphasis added)

### 7.4.9.1    General slice segment data semantics

**end_of_slice_segment_flag** equal to 0 specifies that another CTU is following in the slice. end_of_slice_segment_flag equal to 1 specifies the end of the slice segment, i.e., that no further CTU follows in the slice segment.

Source: https://www.itu.int/rec/T-REC-H.265/en (emphasis added)

***Damages***

57.    Plaintiff has been damaged as a result of ByteDance's infringing conduct described in this Count. ByteDance is, thus, liable to Plaintiff in an amount that adequately compensates Plaintiff for ByteDance's infringements, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

### COUNT II

#### (INFRINGEMENT OF U.S. PATENT NO. 8,019,169)

58.    Plaintiff incorporates the preceding paragraphs herein by reference.

59.     This cause of action arises under the patent laws of the United States, and, in particular, 35 U.S.C. §§ 271, *et seq*.

60.     Plaintiff is the owner of all substantial rights, title, and interest in and to the '169 Patent including the right to exclude others and to enforce, sue, and recover damages for past infringements.

61.     The '169 Patent is valid, enforceable, and was duly and legally issued by the United States Patent and Trademark Office on September 13, 2011, after full and fair examination.

62.     ByteDance has directly and/or indirectly infringed one or more claims of the '169 Patent in this District and elsewhere in Texas and the United States by making, offering to sell, selling, testing, using, and/or importing ByteDance products, their components and processes, and/or products containing the same that incorporate the fundamental technologies covered by the '169 Patent, including, but not limited to, the HEVC Accused Products.

*Direct Infringement (35 U.S.C. § 271(a))*

63.     ByteDance has directly infringed one or more claims of the '169 Patent in this District and elsewhere in Texas and the United States.

64.     ByteDance has directly infringed, either by itself or via its agent(s), at least claim 21 of the '169 Patent as set forth under 35 U.S.C. § 271(a) by making, offering to sell, selling, testing, and/or using the HEVC Accused Products.

65.      By way of illustration only, ByteDance, via the HEVC Accused Products, performs each and every element of claim 21 of the '169 Patent. To the extent the preamble is limiting, the HEVC Accused Products perform "[a]n image decoding method." For example, each HEVC Accused Product supports HEVC (H.265), which describes the method by which each HEVC Accused Product decodes an image.

> **8.1    General decoding process**
>
> **8.1.1    General**
>
> Input to this process is a bitstream. Output of this process is a list of decoded pictures.
>
> The decoding process is specified such that all decoders that conform to a specified profile, tier and level will produce numerically identical cropped decoded output pictures when invoking the decoding process associated with that profile for a bitstream conforming to that profile, tier and level. Any decoding process that produces identical cropped decoded output pictures to those produced by the process described herein (with the correct output order or output timing, as specified) conforms to the decoding process requirements of this Specification.

Source: https://www.itu.int/rec/T-REC-H.265/en (emphasis added)

66.    The HEVC Accused Products acquire "a bit stream and additional information which indicates a first still image." For example, the HEVC Accused Products receive an input bitstream and perform a sub-bitstream extraction process to generate a filtered bitstream (referred to as "BitstreamToDecode"). This filtered bitstream comprises NAL units from the original "entireBitstream" that belong to a target set defined by sub-bitstream extraction parameters (e.g., OpTid and OpLayerIDList), with NAL units outside the target set removed. The filtered bitstream includes additional information (e.g., slice header syntax elements such as picture order count values) that identifies and distinguishes a current picture to be decoded. The NAL units in BitstreamToDecode are then decoded to reconstruct picture data corresponding to the current picture (e.g., a first still image).

> **8.1    General decoding process**
>
> **8.1.1    General**
>
> Input to this process is a bitstream. Output of this process is a list of decoded pictures.

Source: https://www.itu.int/rec/T-REC-H.265/en (emphasis added)

> **8.1.3    Decoding process for a coded picture with nuh_layer_id equal to 0**
>
> The decoding processes specified in this clause apply to each coded picture with nuh_layer_id equal to 0, referred to as the current picture and denoted by the variable CurrPic, in BitstreamToDecode.

Source: https://www.itu.int/rec/T-REC-H.265/en (emphasis added)

> **F.8.1.3  Common decoding process for a coded picture**
>
> The decoding processes specified in the remainder of this clause apply to each coded picture, referred to as the current picture and denoted by the variable CurrPic, in BitstreamToDecode.

Source: https://www.itu.int/rec/T-REC-H.265/en (emphasis added)

> **sub-bitstream extraction process**: A specified process by which *NAL units* in a *bitstream* that do not belong to a target set, determined by a target highest TemporalId and a target *layer identifier list*, are removed from the *bitstream*, with the output sub-bitstream consisting of the NAL units in the *bitstream* that belong to the target set.

Source: https://www.itu.int/rec/T-REC-H.265/en (emphasis added)

> A layer set is identified by the associated layer identifier list. The i-th layer set specified by the VPS is associated with the layer identifier list LayerSetLayerIdList[ i ], for i in the range of 0 to vps_num_layer_sets_minus1, inclusive.
>
> A layer set consists of all operation points that are associated with the same layer identifier list.
>
> Each operation point is identified by the associated layer identifier list, denoted as OpLayerIdList, which consists of the list of nuh_layer_id values of all NAL units included in the operation point, in increasing order of nuh_layer_id values, and a variable OpTid, which is equal to the highest TemporalId of all NAL units included in the operation point. The bitstream subset associated with the operation point identified by OpLayerIdList and OpTid is the output of the sub-bitstream extraction process as specified in clause 10 with the bitstream, the target highest TemporalId equal to OpTid, and the target layer identifier list equal to OpLayerIdList as inputs. The OpLayerIdList and OpTid that identify an operation point are also referred to as the OpLayerIdList and OpTid associated with the operation point, respectively.

Source: https://www.itu.int/rec/T-REC-H.265/en (emphasis added)

> For each test, the following ordered steps apply in the order listed, followed by the processes described after these steps in this clause:
>
> 1.   An operation point under test, denoted as TargetOp, is selected by selecting a layer identifier list OpLayerIdList and a target highest TemporalId value OpTid. The layer identifier list OpLayerIdList of TargetOp either consists of all the nuh_layer_id values of the VCL NAL units present in entireBitstream or consists of all the nuh_layer_id values of a layer set specified by the active VPS. The value of OpTid is in the range of 0 to sps_max_sub_layers_minus1, inclusive. The values of OpLayerIdList and OpTid are such that the sub-bitstream BitstreamToDecode that is the output by invoking the sub-bitstream extraction process as specified in clause 10 with entireBitstream, OpTid and OpLayerIdList as inputs satisfy both of the following conditions:
>
> –   There is at least one VCL NAL unit in BitstreamToDecode with nuh_layer_id equal to each of the nuh_layer_id values in OpLayerIdList.
>
> –   There is at least one VCL NAL unit with TemporalId equal to OpTid in BitstreamToDecode.

Source: https://www.itu.int/rec/T-REC-H.265/en (emphasis added)

67.    The HEVC Accused Products acquire "a second still image indicated in the additional information." For example, the HEVC Accused Products select a reference picture (e.g.,

a second still image) based on additional information within the filtered bitstream (e.g., slice header syntax elements), which identifies candidate reference pictures (e.g., via a reference picture set) and signals selection of a specific reference picture (e.g., via reference indices into a reference picture list).

> **8.3.2    Decoding process for reference picture set**
>
> This process is invoked once per picture, after decoding of a slice header but prior to the decoding of any coding unit and prior to the decoding process for reference picture list construction for the slice as specified in clause 8.3.4. This process may result in one or more reference pictures in the DPB being marked as "unused for reference" or "used for long-term reference".
>
> NOTE 1 – The RPS is an absolute description of the reference pictures used in the decoding process of the current and future coded pictures. The RPS signalling is explicit in the sense that all reference pictures included in the RPS are listed explicitly.

Source: https://www.itu.int/rec/T-REC-H.265/en (emphasis added)

> **F.8.3.4   Decoding process for reference picture lists construction**
>
> This process is invoked at the beginning of the decoding process for each P or B slice.
>
> Reference pictures are addressed through reference indices as specified in clause 8.5.3.3.2. A reference index is an index into a reference picture list. When decoding a P slice, there is a single reference picture list RefPicList0. When decoding a B slice, there is a second independent reference picture list RefPicList1 in addition to RefPicList0.
>
> At the beginning of the decoding process for each slice, the reference picture lists RefPicList0 and, for B slices, RefPicList1 are derived as follows:

Source: https://www.itu.int/rec/T-REC-H.265/en (emphasis added)

> **8.5.3.3.2   Reference picture selection process**
>
> Input to this process is a reference index refIdxLX.
>
> Output of this process is a reference picture consisting of a two-dimensional array of luma samples $refPicLX_L$ and, when ChromaArrayType is not equal to 0, two two-dimensional arrays of chroma samples $refPicLX_{Cb}$ and $refPicLX_{Cr}$.
>
> The output reference picture RefPicListX[ refIdxLX ] consists of a pic_width_in_luma_samples by pic_height_in_luma_samples array of luma samples $refPicLX_L$ and, when ChromaArrayType is not equal to 0, two PicWidthInSamplesC by PicHeightInSamplesC arrays of chroma samples $refPicLX_{Cb}$ and $refPicLX_{Cr}$.
>
> The reference picture sample arrays $refPicLX_L$, $refPicLX_{Cb}$ and $refPicLX_{Cr}$ correspond to decoded sample arrays $S_L$, $S_{Cb}$ and $S_{Cr}$ derived in clause 8.7 for a previously-decoded picture.

Source: https://www.itu.int/rec/T-REC-H.265/en (emphasis added)

68.    The HEVC Accused Products generate "a predictive image for the first image using the second still image as a reference image." For example, the HEVC Accused Products generate

a predictive image for a current picture (e.g., the first image) by performing inter prediction using

a reference picture (e.g., the second still image).

---

**inter prediction**: A *prediction* derived in a manner that is dependent on data elements (e.g., sample values or motion vectors) of one or more *reference pictures*.

> NOTE – A prediction from a reference picture that is the current picture itself is also inter prediction.

---

Source: https://www.itu.int/rec/T-REC-H.265/en (emphasis added)

---

**8.4      Decoding process for coding units coded in intra prediction mode**

**8.4.1      General decoding process for coding units coded in intra prediction mode**

Inputs to this process are:

– a luma location ( xCb, yCb ) specifying the top-left sample of the current luma coding block relative to the top-left luma sample of the current picture,

– a variable log2CbSize specifying the size of the current luma coding block.

Output of this process is a modified reconstructed picture before deblocking filtering.

---

Source: https://www.itu.int/rec/T-REC-H.265/en (emphasis added)

---

**8.5.2      Inter prediction process**

This process is invoked when decoding coding unit whose CuPredMode[ xCb ][ yCb ] is not equal to MODE_INTRA.

Inputs to this process are:

– a luma location ( xCb, yCb ) specifying the top-left sample of the current luma coding block relative to the top-left luma sample of the current picture,

– a variable log2CbSize specifying the size of the current luma coding block.

Outputs of this process are:

– an $(nCbS_L)x(nCbS_L)$ array predSamples$_L$ of luma prediction samples, where nCbS$_L$ is derived as specified below,

– when ChromaArrayType is not equal to 0, an $(nCbSw_C)x(nCbSh_C)$ array predSamples$_{Cb}$ of chroma prediction samples for the component Cb, where nCbSw$_C$ and nCbSh$_C$ are derived as specified below,

– when ChromaArrayType is not equal to 0, an $(nCbSw_C)x(nCbSh_C)$ array predSamples$_{Cr}$ of chroma prediction samples for the component Cr, where nCbSw$_C$ and nCbSh$_C$ are derived as specified below.

---

Source: https://www.itu.int/rec/T-REC-H.265/en (emphasis added)

69.      The HEVC Accused Products add "prediction residual obtained from the bit stream

indicating the first image and the predictive image to obtain the first still image." For example, the

HEVC Accused Products obtain prediction residual samples from the bitstream that are associated

with a current picture (e.g., a first still image), as identified by additional information in the bitstream (e.g., slice header syntax elements). The HEVC Accused Products then add these residual samples to a predictive image generated for the current picture to reconstruct the first still image.

The decoding process for coding units coded in inter prediction mode consists of the following ordered steps:

1. The inter prediction process as specified in clause 8.5.2 is invoked with the luma location ( xCb, yCb ) and the luma coding block size log2CbSize as inputs, and the outputs are the array $predSamples_L$ and, when ChromaArrayType is not equal to 0, the arrays $predSamples_{Cb}$ and $predSamples_{Cr}$.

2. The decoding process for the residual signal of coding units coded in inter prediction mode specified in clause 8.5.4 is invoked with the luma location ( xCb, yCb ) and the luma coding block size log2CbSize as inputs, and the outputs are the array $resSamples_L$ and, when ChromaArrayType is not equal to 0, the arrays $resSamples_{Cb}$ and $resSamples_{Cr}$.

Source: https://www.itu.int/rec/T-REC-H.265/en (emphasis added)

**8.6.7    Picture construction process prior to in-loop filter process**

Inputs to this process are:

– a location ( xCurr, yCurr ) specifying the top-left sample of the current block relative to the top-left sample of the current picture component,

– the variables nCurrSw and nCurrSh specifying the width and height, respectively, of the current block,

– a variable cIdx specifying the colour component of the current block,

– an (nCurrSw)x(nCurrSh) array predSamples specifying the predicted samples of the current block,

– an (nCurrSw)x(nCurrSh) array resSamples specifying the residual samples of the current block.

Depending on the value of the colour component cIdx, the following assignments are made:

– If cIdx is equal to 0, recSamples corresponds to the reconstructed picture sample array $S_L$ and the function clipCidx1 corresponds to $Clip1_Y$.

– Otherwise, if cIdx is equal to 1, recSamples corresponds to the reconstructed chroma sample array $S_{Cb}$ and the function clipCidx1 corresponds to $Clip1_C$.

– Otherwise (cIdx is equal to 2), recSamples corresponds to the reconstructed chroma sample array $S_{Cr}$ and the function clipCidx1 corresponds to $Clip1_C$.

The (nCurrSw)x(nCurrSh) block of the reconstructed sample array recSamples at location ( xCurr, yCurr ) is derived as follows:

$$recSamples[\ xCurr + i\ ][\ yCurr + j\ ] = clipCidx1(\ predSamples[\ i\ ][\ j\ ] + resSamples[\ i\ ][\ j\ ]\ ) \qquad (8\text{-}325)$$
$$\text{with } i = 0..nCurrSw - 1, j = 0..nCurrSh - 1$$

Source: https://www.itu.int/rec/T-REC-H.265/en (emphasis added)

*Indirect Infringement (35 U.S.C. §§ 271(b), (c))*

70.    At a minimum, ByteDance has known of the '169 Patent at least as early as the filing date of this Original Complaint. In addition, ByteDance has known about the '169 Patent since at least July 3, 2025, when ByteDance received Plaintiff's correspondence via FedEx. Moreover, ByteDance has known of the '169 Patent and Plaintiff's theories of infringement prior to this Original Complaint being filed, as described in the foregoing. *Supra* ¶¶ 21-24.

71.    On information and belief, since at least the above-mentioned date when ByteDance was on notice of its infringement, ByteDance has actively induced, under 35 U.S.C. § 271(b), its distributors, customers, subsidiaries, importers, and/or consumers that import, purchase, or sell the HEVC Accused Products that include or are made using all of the limitations of one or more claims of the '169 Patent to directly infringe one or more claims of the '169 Patent (e.g., claim 21, as discussed above) by using, offering for sale, selling, and/or importing the HEVC Accused Products. Since at least the notice provided on the above-mentioned date, ByteDance does so with knowledge, or with willful blindness of the fact, that the induced acts constitute infringement of the '169 Patent. ByteDance intends to cause, and has taken affirmative steps to induce infringement by its distributors, importers, customers, subsidiaries, and/or consumers by at least, inter alia, creating advertisements that promote the infringing use of the HEVC Accused Products, creating and/or maintaining established distribution channels for the HEVC Accused Products into and within the United States, manufacturing the HEVC Accused Products in conformity with U.S. laws and regulations, distributing or making available instructions or manuals for these products to purchasers and prospective buyers, and testing the HEVC Accused Products, and/or providing technical support or services for these products to these purchasers in the United States. *See, e.g.,* https://www.tiktok.com/support (TikTok Support); https://www.tiktok

.com/safety/en/tools-and-guides/new-user-guide (TikTok User Guide); https://www.capcut.com/help (CapCut Help & Support); https://www.capcut.com/resource/capcut-tutorial-for-beginners (CapCut Tutorial for Beginners); https://www.byteplus.com/en/product/tos (advertising BytePlus Torch Object Storage); https://www.byteplus.com/en/product/rtc (offering BytePlus RTC demos); https://docs.byteplus.com/en/docs/byteplus-rtc/docs-1163794 (same); https://docs.byteplus.com/en/docs/byteplus-rtc/docs-69865 (BytePlus RTC quick start guide); https://www.byteplus.com/en/product/vod (offering BytePlus Video on Demand demos); https://docs.byteplus.com/en/docs/byteplus-vod/docs-getting-started (BytePlus Video on Demand quick start guide); https://www.byteplus.com/en/product/medialive (offering BytePlus MediaLive demos); https://docs.byteplus.com/en/docs/byteplus-media-live/docs-getting-started (BytePlus MediaLive quick start guide). For example, ByteDance configures, designs, offers to sell, and sells the HEVC Accused Products and such HEVC Accused Products contain specific instructions, such as source code and configuration files, that cause such products to infringe the '169 Patent. For example, the instructions such as source code and configuration files of the HEVC Accused Products perform image decoding that infringe the '169 Patent.

72.    In the alternative, on information and belief, since at least the above-mentioned date when ByteDance was on notice of its infringement, ByteDance has contributorily infringed, under 35 U.S.C. § 271(c), one or more claims of the '169 Patent. For example, ByteDance contributes to the direct infringement of such claims by distributors, customers, subsidiaries, importers, and/or consumers that use, import, purchase, or sell the HEVC Accused Products. To the extent that the HEVC Accused Products do not directly infringe one or more claims of the '169 Patent, such products contain instructions, such as source code, that are especially adapted to cause the HEVC Accused Products to operate in an infringing manner. Such instructions are specifically designed

to cause the HEVC Accused Products to perform in an infringing manner and are a material part of the invention of the '169 Patent and are not a staple article of commerce suitable for substantial non-infringing use. For example, the HEVC Accused Products generate a predictive image from a reference image, functionality that is not generic and is especially made and specifically adapted to perform the image decoding that infringes the '169 Patent. Further, the generation of a predictive image from a reference image in the HEVC Accused Products is a core functionality that inherently infringes the '169 Patent and lacks any substantial non-infringing use.

*Damages*

73.    On information and belief, despite having knowledge of the '169 Patent and knowledge that it is directly and/or indirectly infringing one or more claims of the '169 Patent, ByteDance has nevertheless continued its infringing conduct and disregarded an objectively high likelihood of infringement. ByteDance's infringing activities relative to the '169 Patent have been, and continue to be, willful, wanton, malicious, in bad-faith, deliberate, consciously wrongful, flagrant, and an egregious case of misconduct beyond typical infringement such that Plaintiff is entitled under 35 U.S.C. § 284 to enhanced damages up to three times the amount found or assessed.

74.    Plaintiff has been damaged as a result of ByteDance's infringing conduct described in this Count. ByteDance is, thus, liable to Plaintiff in an amount that adequately compensates Plaintiff for ByteDance's infringements, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

## COUNT III

### (INFRINGEMENT OF U.S. PATENT NO. 8,737,476)

75.    Plaintiff incorporates the preceding paragraphs herein by reference.

76.    This cause of action arises under the patent laws of the United States, and, in particular, 35 U.S.C. §§ 271, *et seq*.

77.    Plaintiff is the owner of all substantial rights, title, and interest in and to the '476 Patent including the right to exclude others and to enforce, sue, and recover damages for past infringements.

78.    The '476 Patent is valid, enforceable, and was duly and legally issued by the United States Patent and Trademark Office on May 27, 2014, after full and fair examination.

79.    ByteDance has directly and/or indirectly infringed one or more claims of the '476 Patent in this District and elsewhere in Texas and the United States by making, offering to sell, selling, testing, using, and/or importing ByteDance products, their components and processes, and/or products containing the same that incorporate the fundamental technologies covered by the '476 Patent, including, but not limited to, the HEVC Accused Products.

***Direct Infringement (35 U.S.C. § 271(a))***

80.    ByteDance has directly infringed one or more claims of the '476 Patent in this District and elsewhere in Texas and the United States.

81.    ByteDance has directly infringed, either by itself or via its agent(s), at least claim 14 of the '476 Patent as set forth under 35 U.S.C. § 271(a) by making, offering to sell, selling, testing, and/or using the HEVC Accused Products.

82.    By way of illustration only, ByteDance, via the HEVC Accused Products, performs each and every element of claim 14 of the '476 Patent. To the extent the preamble is limiting, the HEVC Accused Products perform "[a]n image decoding method of decoding coded image data on a block-by-block basis, the coded image data being resulted from coding, on a block-by-block basis, of image data partitioned into blocks each of which has a predetermined number of pixels."

For example, each HEVC Accused Product decodes coded images on a block-by-block basis. The images are partitioned into blocks (e.g., CTUs) that have a predetermined number of pixels (e.g., 64 x 64 pixels).



Figure 2: Structure of an HEVC encoder and decoder

Source: https://www.vcodex.com/hevc-an-introducti on-to-high-efficiency-coding/ (emphasis added)



Figure 3: Picture, slice, Coding Tree Unit (CTU), Coding Units (CUs)

Source: https://www.vcodex.com/hevc-an-introducti
on-to-high-efficiency-coding/ (emphasis added)



Source: https://www.vcodex.com/hevc-an-introduction-to-high-efficiency-coding/



Source: https://www.vcodex.com/hevc-an-introduction-to-high-efficiency-coding/

| Options | Value |
|---|---|
| Max. CU size | 64×64 |
| Max. partition depth | 4 |
| Transform size: Min.-Max. | 4-32 |
| Period of I-frames | 256 |
| Number of B-frames (GOP Size) | 8 |
| Number of reference frames | 4 |
| Motion estimation algorithm | EPZS [25] |
| Search range | 48 |
| Asymmetrical Motion Partition | Enabled |
| Internal bit depth | 8 |
| Sample Adaptive Offset (SAO) | Enabled |
| Wavefront Parallel Processing (WPP) | Enabled |
| Quantization Parameter (QP) | 22, 26, 30, 34 |

**Table 2** Coding options.

Source: https://www.researchgate.net/publication/235760260_Parallel
_HEVC_Decoding_on_Multi-_and_Many-core_Architectures (emphasis added)

83.    The HEVC Accused Products pre-decode "on a block-by-block basis, reference

information indicating a number of reference images to be referred to on a block-by-block basis

for decoding the coded image data." For example, the HEVC Accused Products obtain reference information that indicates a number of reference images for decoding an image slice prior to decoding the current image to be decoded on a block-by-block basis. In particular, the HEVC Accused Products receive information via the slice header including RPS (Reference Picture Set) information, which contains reference information indicating the number of images to be referred to for decoding an image slice. Further, RPS contains syntax and index structures that refer to one or more reference pictures and how those reference pictures are used to decode image slices.

> *E. Order of Picture Decoding and DPB Operations*
>
> The order of picture decoding and DPB operations in HEVC is changed compared to H.264/AVC in order to exploit the advantages of RPS and improve error resilience. In H.264/AVC picture marking and buffer operations (both output and removal of decoded pictures from the DPB) are applied after a current picture has been decoded, with the exception of when gaps in FrameNum are detected. In HEVC, the RPS is first decoded from a slice header of the current picture, then picture marking and buffer operations are applied before decoding the current picture.

Source: https://www.researchgate.net/publication/260665391_Overview_of_HEVC_High-Level_Syntax_and_Reference_Picture_Management (emphasis added)



Figure 3: Picture, slice, Coding Tree Unit (CTU), Coding Units (CUs)

Source: https://www.vcodex.com/hevc-an-introducti
on-to-high-efficiency-coding/ (emphasis added)



Source: https://www.vcodex.com/hevc-an-introduction-to-high-efficiency-coding/

PLAINTIFF'S ORIGINAL COMPLAINT                42

## 2.4   Picture Buffering Management

### 2.4.1   Picture Order Count and the DPB

Every picture in HEVC has a picture order count (POC) value assigned to it, denoted as PicOrderCntVal. It has three main uses: to uniquely identify pictures, to indicate the output position relative to other pictures in the same CVS, and to perform motion vector scaling within the lower-level VCL decoding process. All pictures in the same CVS must have a unique POC value. Pictures from different CVSs may share the same POC value, but pictures can still be uniquely identified since there are no possibilities to mix pictures from one CVS with any picture of another CVS. Gaps in POC values are allowed in a CVS—i.e., the POC value difference between two pictures that are consecutive in output order can differ by more than one (and in fact the amount by which the POC values for consecutive pictures may differ can vary arbitrarily).

　　The POC value of a picture is signaled by the slice_pic_order_cnt_lsb codeword in the slice header. The range of allowed POC values is from $-2^{31}$ to $2^{31} - 1$, so in order to save bits in the slice header, only the least significant bits of the POC value (POC LSB) is signaled. The number of bits to use for POC LSB can be between 4 and 16, and is signaled in the SPS. Since only the POC LSB is signaled in the slice header, the most significant POC value bits (POC MSB) for the current picture are derived from a previous picture, called prevTid0Pic. In order for POC derivation to work the same way even if pictures are removed, prevTid0Pic is set to the closest previous picture of temporal layer 0 that is not a RASL picture, a RADL picture, or a sub-layer non-reference picture. The decoder derives the POC MSB value by comparing the POC value of the current picture with the POC value of the prevTid0Pic picture.

Source: Vivienne Sze, Madhukar Budagavi & Gary J. Sullivan eds., *High Efficiency Video Coding (HEVC): Algorithms and Architectures*, p. 35 (Springer 2014) (emphasis added)



| Picture | RPS {reference picture, used by current picture} |
|---------|--------------------------------------------------|
| $I_0$ | – |
| $P_1$ | $\{I_0, 1\}$ |
| $B_2$ | $\{I_0, 1\}$, $\{P_1, 1\}$ |
| $B_3$ | $\{I_0, 1\}$, $\{P_1, 0\}$, $\{B_2, 1\}$ |
| $B_4$ | $\{P_1, 1\}$, $\{B_2, 1\}$ |

Source: https://www.researchgate.net/publication/260665391_Ove rview_of_HEVC_High-Level_Syntax_and_Reference_Picture_Management

84.     The HEVC Accused Products calculate, "on a block-by-block basis using the reference information, a predictive data amount of a reference image to be read out on a block-by-block basis from a storage unit for decoding the coded image data, the storage unit storing data of at least one reference image to be referred to for decoding the coded image data." For example, the HEVC Accused Products, using RPS information (including the reference images to be used for decoding an image slice) stored in the DPB (Decoded Picture Buffer), calculate the amount of reference image data required to decode an image slice. In one non-limiting example demonstrated below, for $n$ number of reference images, the total predictive data amount is $n$ times the data amount of one reference image. To decode the image $B_2$, the HEVC Accused Products calculate that a predictive data amount associated with two reference images ($I_0$ and $P_1$) is to be read out from the DPB.



Source: https://www.researchgate.net/publication/260665391_Ove
rview_of_HEVC_High-Level_Syntax_and_Reference_Picture_Management

An example of a coding structure is shown in Fig. 7. The RPSs for the pictures in Fig. 7 are shown in Table II. The first picture in decoding order is an IDR picture, $I_0$, for which no RPS is signaled since it is the first picture in the coded video sequence and no picture that precedes the IDR picture in decoding order can be used for reference by the IDR picture or by any picture that follows the IDR picture in decoding order. The second picture in decoding order, $P_1$, uses $I_0$ for reference. It must therefore include $I_0$ in its RPS. Picture $B_2$ uses both $I_0$ and $P_1$ for reference so they are both included in the RPS of $B_2$.

Source: https://www.researchgate.net/publication/260665391_Overview_of_HEVC_High-Level_Syntax_and_Reference_Picture_Management

## 2.4 Picture Buffering Management

### 2.4.1 Picture Order Count and the DPB

Every picture in HEVC has a picture order count (POC) value assigned to it, denoted as PicOrderCntVal. It has three main uses: to uniquely identify pictures, to indicate the output position relative to other pictures in the same CVS, and to perform motion vector scaling within the lower-level VCL decoding process. All pictures in the same CVS must have a unique POC value. Pictures from different CVSs may share the same POC value, but pictures can still be uniquely identified since there are no possibilities to mix pictures from one CVS with any picture of another CVS. Gaps in POC values are allowed in a CVS—i.e., the POC value difference between two pictures that are consecutive in output order can differ by more than one (and in fact the amount by which the POC values for consecutive pictures may differ can vary arbitrarily).

The POC value of a picture is signaled by the slice_pic_order_cnt_lsb codeword in the slice header. The range of allowed POC values is from $-2^{31}$ to $2^{31} - 1$, so in order to save bits in the slice header, only the least significant bits of the POC value (POC LSB) is signaled. The number of bits to use for POC LSB can be between 4 and 16, and is signaled in the SPS. Since only the POC LSB is signaled in the slice header, the most significant POC value bits (POC MSB) for the current picture are derived from a previous picture, called prevTid0Pic. In order for POC derivation to work the same way even if pictures are removed, prevTid0Pic is set to the closest previous picture of temporal layer 0 that is not a RASL picture, a RADL picture, or a sub-layer non-reference picture. The decoder derives the POC MSB value by comparing the POC value of the current picture with the POC value of the prevTid0Pic picture.

The decoded picture buffer (DPB) in HEVC is a buffer that contains decoded pictures. Decoded pictures other than the current picture may be stored in the DPB either because they are needed for reference, or because they have not been output yet, something that is necessary to enable out-of-order output. Note that the current decoded picture is also stored in the DPB. Figure 2.12 shows two example referencing structures that both need a DPB size of at least three pictures. Pictures $P_1$ and $P_2$ in Fig 2.12a both need to be stored in the DPB when $P_3$ is being decoded since they are both output after $P_3$. The DPB therefore needs to be capable to store $P_1$, $P_2$, and $P_3$ simultaneously. In Fig. 2.12b, each picture uses two reference pictures so the DPB needs to be large enough to store three pictures simultaneously here as well. The referencing structure in Fig. 2.12b is an example of a so-called low-delay B structure, in which bi-prediction is extensively used without any out-of-order output.

Source: Vivienne Sze, Madhukar Budagavi & Gary J. Sullivan eds., *High Efficiency Video Coding (HEVC): Algorithms and Architectures*, p. 35 (Springer 2014) (emphasis added)

85.    The HEVC Accused Products determine, "using the predictive data amount calculated, multiple blocks in the coded image data which are to be decoded in parallel, in such a manner as to reduce variation in amounts of data read out from the storage unit." For example, the

HEVC Accused Products determine, using the predictive data and reference images, the blocks (CTUs) that are to be decoded in parallel in the current image. In particular, as demonstrated in one non-limiting example below, the HEVC Accused Products determine the multiple blocks in image $B_2$ to be decoded in parallel using reference images $I_0$ and $P_1$.



Source: https://www.researchgate.net/publication/260665391_Ove rview_of_HEVC_High-Level_Syntax_and_Reference_Picture_Management



Source: https://www.researchgate.net/publication/260665391_Over view_of_HEVC_High-Level_Syntax_and_Reference_Picture_Management

PLAINTIFF'S ORIGINAL COMPLAINT　　　　47



Source: https://www.researchgate.net/publication/260665391_Ov
erview_of_HEVC_High-Level_Syntax_and_Reference_Picture_Management



Source: https://www.vcodex.com/hevc-an-introduction-to-high-efficiency-coding/

86.     The HEVC Accused Products decode "in parallel the determined multiple blocks in the coded image data." For example, as shown below in one non-limiting example, the HEVC

Accused Products decode multiple blocks in image $B_2$ in parallel while using images $I_0$ and $P_1$ as reference images.

In WPP, the picture is partitioned into single rows of coding tree units (CTUs). Entropy decoding and prediction are allowed to use data from CTUs in other partitions. Parallel processing is possible through parallel decoding of CTU rows, where the start of the decoding of a CTU row is delayed by two CTUs, so to ensure that data related to a CTU above and to the right of the subject CTU is available before the subject CTU is being decoded. Using this staggered start (which appears like a wavefront when represented graphically), parallelization is possible with up to as many processors/cores as the picture contains CTU rows. Because in-picture prediction between neighboring

Source: https://www.researchgate.net/publication/260665391_Ove rview_of_HEVC_High-Level_Syntax_and_Reference_Picture_Management



Source: https://www.researchgate.net/publication/260665391_Ove rview_of_HEVC_High-Level_Syntax_and_Reference_Picture_Management



Source: https://www.vcodex.com/hevc-an-introduction-to-high-efficiency-coding/

***Indirect Infringement (35 U.S.C. §§ 271(b), (c))***

87.     At a minimum, ByteDance has known of the '476 Patent at least as early as the filing date of this Original Complaint. In addition, ByteDance has known about the '476 Patent since at least July 3, 2025, when ByteDance received Plaintiff's correspondence via FedEx. Moreover, ByteDance has known of the '476 Patent and Plaintiff's theories of infringement prior to this Original Complaint being filed, as described in the foregoing. *Supra* ¶¶ 21-24.

88.     On information and belief, since at least the above-mentioned date when ByteDance was on notice of its infringement, ByteDance has actively induced, under 35 U.S.C. § 271(b), its distributors, customers, subsidiaries, importers, and/or consumers that import, purchase, or sell the HEVC Accused Products that include or are made using all of the limitations of one or more claims of the '476 Patent to directly infringe one or more claims of the '476 Patent (e.g., claim 14, as discussed above) by using, offering for sale, selling, and/or importing the HEVC Accused Products. Since at least the notice provided on the above-mentioned date, ByteDance

does so with knowledge, or with willful blindness of the fact, that the induced acts constitute infringement of the '476 Patent. ByteDance intends to cause, and has taken affirmative steps to induce infringement by its distributors, importers, customers, subsidiaries, and/or consumers by at least, inter alia, creating advertisements that promote the infringing use of the HEVC Accused Products, creating and/or maintaining established distribution channels for the HEVC Accused Products into and within the United States, manufacturing the HEVC Accused Products in conformity with U.S. laws and regulations, distributing or making available instructions or manuals for these products to purchasers and prospective buyers, and testing the HEVC Accused Products, and/or providing technical support or services for these products to these purchasers in the United States. *See, e.g.,* https://www.tiktok.com/support (TikTok Support); https://www.tiktok .com/safety/en/tools-and-guides/new-user-guide (TikTok User Guide); https://www.capcut.com/h elp (CapCut Help & Support); https://www.capcut.com/resource/capcut-tutorial-for-beginners (CapCut Tutorial for Beginners); https://www.byteplus.com/en/product/tos (advertising BytePlus Torch Object Storage); https://www.byteplus.com/en/product/rtc (offering BytePlus RTC demos); https://docs.byteplus.com/en/docs/byteplus-rtc/docs-1163794 (same); https://docs.byteplus.com/e n/docs/byteplus-rtc/docs-69865 (BytePlus RTC quick start guide); https://www.byteplus.com/en/p roduct/vod (offering BytePlus Video on Demand demos); https://docs.byteplus.com/en/docs/bytep lus-vod/docs-getting-started (BytePlus Video on Demand quick start guide); https://www.byteplus .com/en/product/medialive (offering BytePlus MediaLive demos); https://docs.byteplus.com/en/d ocs/byteplus-media-live/docs-getting-started (BytePlus MediaLive quick start guide). For example, ByteDance configures, designs, offers to sell, and sells the HEVC Accused Products and such HEVC Accused Products contain specific instructions, such as source code and configuration files, that cause such products to infringe the '476 Patent. For example, the instructions such as

source code and configuration files of the HEVC Accused Products perform image decoding that infringe the '476 Patent.

89.    In the alternative, on information and belief, since at least the above-mentioned date when ByteDance was on notice of its infringement, ByteDance has contributorily infringed, under 35 U.S.C. § 271(c), one or more claims of the '476 Patent. For example, ByteDance contributes to the direct infringement of such claims by distributors, customers, subsidiaries, importers, and/or consumers that use, import, purchase, or sell the HEVC Accused Products. To the extent that the HEVC Accused Products do not directly infringe one or more claims of the '476 Patent, such products contain instructions, such as source code, that are especially adapted to cause the HEVC Accused Products to operate in an infringing manner. Such instructions are specifically designed to cause the HEVC Accused Products to perform in an infringing manner and are a material part of the invention of the '476 Patent and are not a staple article of commerce suitable for substantial non-infringing use. For example, the HEVC Accused Products implement pre-decoding on a block-by-block basis reference information, functionality that is not generic and is especially made and specifically adapted to perform the image decoding method that infringes the '476 Patent. Further, the pre-decoding in the HEVC Accused Products is a core functionality that inherently infringes the '476 Patent and lacks any substantial non-infringing use.

*Damages*

90.    On information and belief, despite having knowledge of the '476 Patent and knowledge that it is directly and/or indirectly infringing one or more claims of the '476 Patent, ByteDance has nevertheless continued its infringing conduct and disregarded an objectively high likelihood of infringement. ByteDance's infringing activities relative to the '476 Patent have been, and continue to be, willful, wanton, malicious, in bad-faith, deliberate, consciously wrongful,

flagrant, and an egregious case of misconduct beyond typical infringement such that Plaintiff is entitled under 35 U.S.C. § 284 to enhanced damages up to three times the amount found or assessed.

91.     Plaintiff has been damaged as a result of ByteDance's infringing conduct described in this Count. ByteDance is, thus, liable to Plaintiff in an amount that adequately compensates Plaintiff for ByteDance's infringements, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

## COUNT IV

### (INFRINGEMENT OF U.S. PATENT NO. 8,971,401)

92.     Plaintiff incorporates the preceding paragraphs herein by reference.

93.     This cause of action arises under the patent laws of the United States, and, in particular, 35 U.S.C. §§ 271, *et seq*.

94.     Plaintiff is the owner of all substantial rights, title, and interest in and to the '401 Patent including the right to exclude others and to enforce, sue, and recover damages for past infringements.

95.     The '401 Patent is valid, enforceable, and was duly and legally issued by the United States Patent and Trademark Office on March 3, 2015, after full and fair examination.

96.     ByteDance has directly and/or indirectly infringed one or more claims of the '401 Patent in this District and elsewhere in Texas and the United States by making, offering to sell, selling, testing, using, and/or importing ByteDance products, their components and processes, and/or products containing the same that incorporate the fundamental technologies covered by the '401 Patent, including, but not limited to, the HEVC Accused Products.

*Direct Infringement (35 U.S.C. § 271(a))*

97.    ByteDance has directly infringed one or more claims of the '401 Patent in this District and elsewhere in Texas and the United States.

98.    ByteDance has directly infringed, either by itself or via its agent(s), at least claim 1 of the '401 Patent as set forth under 35 U.S.C. § 271(a) by making, offering to sell, selling, testing, and/or using the HEVC Accused Products.

99.     By way of illustration only, the HEVC Accused Products comprise each and every element of claim 1 of the '401 Patent. To the extent the preamble is limiting, the HEVC Accused Products comprise "[a]n image decoding device for processing an input bit stream containing encoded data obtained by encoding a moving picture using intra-frame prediction, where each of the macroblocks of the moving picture includes a plurality of prediction units for the intra-frame prediction." For example, each HEVC Accused Product comprises an image decoding device that is configured to decode input HEVC bitstreams encoded using intra-frame prediction. The CTUs of the video frames include a plurality of Prediction Units (Pus) for intra-prediction.

**prediction unit**: A *prediction block* of *luma* samples, two corresponding *prediction blocks* of *chroma* samples of a *picture* that has three sample arrays, or a *prediction block* of samples of a monochrome *picture* or a *picture* that is coded using three separate colour planes and *syntax structures* used to predict the *prediction block* samples.

Source: https://www.itu.int/rec/T-REC-H.265/en



Source: https://www.researchgate.net/publication/3003152
41_Block_Structures_and_Parallelism_Features_in_HEVC



**Fig. 1**: General diagram of HEVC decoder

Source: https://www.researchgate.net/publication/235760245
_Parallel_video_decoding_in_the_emerging_HEVC_standard

100. The HEVC Accused Products comprise "a stream divider configured to divide the input bit stream into a plurality of sub-streams." For example, each HEVC Accused Product comprises a stream divider configured to divide the input bitstream into sub-streams of color components (including prediction data and transform coefficients) as individual picture blocks are decoded. Specifically, the general decoding process for intra blocks occurs separately for each

color component of the Coding Units (e.g., there is a sub-stream for each of the Y, Cb, and Cr color components).

**8.4.4    Decoding process for intra blocks**

**8.4.4.1    General decoding process for intra blocks**

Inputs to this process are:

– a sample location ( xTb0, yTb0 ) specifying the top-left sample of the current transform block relative to the top-left sample of the current picture,

– a variable log2TrafoSize specifying the size of the current transform block,

– a variable trafoDepth specifying the hierarchy depth of the current block relative to the coding unit,

– a variable predModeIntra specifying the intra prediction mode,

– a variable cIdx specifying the colour component of the current block,

– a variable controlParaAct specifying the applicable processes,

– when controlParaAct is equal to 2, a residual sample array resSamplesRec specifying the reconstructed residual samples for the current colour component of the current coding block.

Output of this process is a modified reconstructed picture before deblocking filtering when controlParaAct is not equal to 1, or a modified residual sample array resSampleArray for the current colour component of the current coding block when controlParaAct is equal to 1.

Source: https://www.itu.int/rec/T-REC-H.265/en (emphasis added)

| CuPredMode | cIdx (Colour component) |
|---|---|
| MODE_INTRA | 0 (Y) |
| MODE_INTRA | 1 (Cb) |
| MODE_INTRA | 2 (Cr) |

Source: https://www.itu.int/rec/T-REC-H.265/en

101.    The HEVC Accused Products comprise "a plurality of image decoders each configured to decode the corresponding one of the plurality of sub-streams, thereby outputting images." For example, the HEVC Accused Products comprise a multi-core architecture that includes a plurality of image decoders including physical and/or logical cores, threads, units, etc. This plurality of image decoders may operate in parallel, for example, for parallel slice decoding.

## 0.3    Purpose

This Recommendation | International Standard was developed in response to the growing need for higher compression of moving pictures for various applications such as videoconferencing, digital storage media, television broadcasting, internet streaming, and communications. It is also designed to enable the use of the coded video representation in a flexible manner for a wide variety of network environments as well as to enable the use of multi-core parallel encoding and decoding devices. The use of this Recommendation | International Standard allows motion video to be manipulated as a form of computer data and to be stored on various storage media, transmitted and received over existing and future networks and distributed on existing and future broadcasting channels. Supports for higher bit depths and enhanced chroma formats, including the use of full-resolution chroma are provided. Support for scalability enables video transmission on networks with varying transmission conditions and other scenarios involving multiple bit rate services. Support for multiview enables representation of video content with multiple camera views and optional auxiliary information. Support for 3D enables joint representation of video content and depth information with multiple camera views.

Source: https://www.itu.int/rec/T-REC-H.265/en (emphasis added)

## II. HEVC CODING DESIGN AND FEATURE HIGHLIGHTS

The HEVC standard is designed to achieve multiple goals, including coding efficiency, ease of transport system integration and data loss resilience, as well as implementability using parallel processing architectures. The following subsections briefly describe the key elements of the design by which these goals are achieved, and the typical encoder operation that would generate a valid bitstream. More details about the associated syntax and the decoding process of the different elements are provided in Sections III and IV.

Source: https://sci-hub.ru/10.1109/TCSVT.2012.2221191

## 4.1  Multi-core requirements

Video resolutions have been increasing rapidly over the past few years. As video resolution move to Ultra HD (e.g. 4kx2k, 8kx4k), one of the challenges facing the real-time video applications today is that a single core video decoder may find it difficult to handle Ultra HD resolution video in real-time. For years, the increase of clock-rates for CPUs has slowed down due to power limitations, despite process scaling [20]; multi-core architecture is widely used to increase performance while keeping cost and power consumption in check. The HEVC has adopted several parallel processing tools into the standard to support parallel processing on multi-core platforms. These tools include Tiles [21], Wavefront Parallel Processing (WPP) [22] and Entropy Slices (ES) [23].

For parallel decoding on multiple core platforms, the following design requirements should be considered:

- Pixel-rate balancing: the selected parallel processing tool should be able to divide a picture into sub-pictures of equal size (in unit of largest coding units, LCUs) so that pixel-rate balancing can be guaranteed when individual cores are processing sub-pictures in parallel [24].
- Line buffers can expensive in terms of area cost and memory bandwidth particularly at higher resolutions. It would be desirable for the selected parallel processing tool to be able to divide a picture into sub-pictures vertically to minimize line buffer size. In other words, the line buffer size per core can be kept constant.

PLAINTIFF'S ORIGINAL COMPLAINT          57

Source: https://www.researchgate.net/publication/256492055_Parallel_
Tools_in_HEVC_for_High-Throughput_Processing (emphasis added)

To make tiles work for parallel decoding processing on multi-core platform, several restrictions would need to be imposed on the bitstream so that a decoder can rely on built-in parallel processing features to dispatch the bitstream to multi-core simultaneously for parallel decoding. Those restrictions are:

1. It should be mandated to divide an Ultra-HD picture into a number of uniformly spaced tiles so that pixel-rate balancing is guaranteed for multiple core platforms. Tile widths should not exceed single core line buffer width partitioning so that the single-core decoder line buffer does not need to be increased when single cores are replicated to build up multi-core decoder

2. Tiles should be independent for minimizing cross-core data communication. Only de-blocking filter, Sample Adaptive Offset (SAO), Adaptive Loop Filter (ALF) can cross tile boundaries.

3. Slices, entropy slices and WPPs, if present, should be contained within tiles and cannot cross tile boundaries

4. Tile sub-stream entries in bitstream are signaled in at picture level, so that a multi-core decoder can dispatch sub-streams to cores in parallel.

With uniformly spaced tiles and restrictions above, HEVC potentially enables a cost-effective way of building multi-core platforms for supporting Ultra-HD real-time decoding. As shown in Figure 14, a 8kx4k at 30 fps decoder can be built by simply replicating the 4kx2k at 30 fps single core decoder four times, and adding a sub-picture boundary processing core to perform e.g. de-blocking filter, Sample Adaptive Offset (SAO), Adaptive Loop Filter (ALF) along tile boundaries.

Source: https://www.researchgate.net/publication/256492055_Parallel_
Tools_in_HEVC_for_High-Throughput_Processing (emphasis added)

102.    The HEVC Accused Products further comprise a stream divider that "divides the encoded data corresponding to one of the macroblocks into groups each made up of at least one of the prediction units and outputs the sub-streams so that the groups are included in different ones of the sub-streams, each of the sub-streams includes prediction units from different macroblocks." The HEVC Accused Products comprise stream dividers configured to divide the encoded data corresponding to one of the CTUs into a plurality of coding blocks, where each group includes at least one of the Prediction Blocks. For example, the luma CBs, containing luma PBs, are included in the respective luma sub-stream and the chroma CBs, containing chroma PBs, are included in the respective chroma sub-streams. The three color plane sub-streams (including prediction data and transform coefficients) comprising each CTU row contain Prediction Blocks from the different CTUs in the CTU rows.



**Fig. 3.2** Illustration of the partitioning of a picture with 1280 × 720 luma samples into macro-blocks and coding tree units: (**a**) Partitioning of the picture into 16 × 16 macroblocks as found in all prior video coding standards of the ITU-T and ISO/IEC; (**b**) Partitioning of the picture into 64 × 64 coding tree units, the largest coding tree unit size supported in the Main profile of HEVC

Source: https://www.researchgate.net/publication/3003152
41_Block_Structures_and_Parallelism_Features_in_HEVC

**6.3.2    Block and quadtree structures**

The samples are processed in units of CTBs. The array size for each luma CTB in both width and height is CtbSizeY in units of samples. The width and height of the array for each chroma CTB are CtbWidthC and CtbHeightC, respectively, in units of samples.

Each CTB is assigned a partition signalling to identify the block sizes for intra or inter prediction and for transform coding. The partitioning is a recursive quadtree partitioning. The root of the quadtree is associated with the CTB. The quadtree is split until a leaf is reached, which is referred to as the coding block. When the component width is not an integer number of the CTB size, the CTBs at the right component boundary are incomplete. When the component height is not an integer multiple of the CTB size, the CTBs at the bottom component boundary are incomplete.

The coding block is the root node of two trees, the prediction tree and the transform tree. The prediction tree specifies the position and size of prediction blocks. The transform tree specifies the position and size of transform blocks. The splitting information for luma and chroma is identical for the prediction tree and may or may not be identical for the transform tree.

The blocks and associated syntax structures are grouped into "unit" structures as follows:

– One prediction block (monochrome picture or separate_colour_plane_flag is equal to 1) or three prediction blocks (luma and chroma components of a picture in 4:2:0 or 4:4:4 colour format) or five prediction blocks (luma and chroma components of a picture in 4:2:2 colour format) and the associated prediction syntax structures units are associated with a prediction unit.

– One transform block (monochrome picture or separate_colour_plane_flag is equal to 1) or three transform blocks (luma and chroma components of a picture in 4:2:0 or 4:4:4 colour format) or five transform blocks (luma and chroma components of a picture in 4:2:2 colour format) and the associated transform syntax structures units are associated with a transform unit.

– One coding block (monochrome picture or separate_colour_plane_flag is equal to 1) or three coding blocks (luma and chroma), the associated coding syntax structures and the associated prediction and transform units are associated with a coding unit.

Source: https://www.itu.int/rec/T-REC-H.265/en

***Indirect Infringement (35 U.S.C. §§ 271(b), (c))***

103.    At a minimum, ByteDance has known of the '401 Patent at least as early as the filing date of this Original Complaint. In addition, ByteDance has known about the '401 Patent since at least July 3, 2025, when ByteDance received Plaintiff's correspondence via FedEx. Moreover, ByteDance has known of the '401 Patent and Plaintiff's theories of infringement prior to this Original Complaint being filed, as described in the foregoing. *Supra* ¶¶ 21-24.

104.    On information and belief, since at least the above-mentioned date when ByteDance was on notice of its infringement, ByteDance has actively induced, under 35 U.S.C. § 271(b), its distributors, customers, subsidiaries, importers, and/or consumers that import, purchase, or sell the HEVC Accused Products that include or are made using all of the limitations of one or

more claims of the '401 Patent to directly infringe one or more claims of the '401 Patent (e.g., claim 1, as discussed above) by using, offering for sale, selling, and/or importing the HEVC Accused Products. Since at least the notice provided on the above-mentioned date, ByteDance does so with knowledge, or with willful blindness of the fact, that the induced acts constitute infringement of the '401 Patent. ByteDance intends to cause, and has taken affirmative steps to induce infringement by its distributors, importers, customers, subsidiaries, and/or consumers by at least, inter alia, creating advertisements that promote the infringing use of the HEVC Accused Products, creating and/or maintaining established distribution channels for the HEVC Accused Products into and within the United States, manufacturing the HEVC Accused Products in conformity with U.S. laws and regulations, distributing or making available instructions or manuals for these products to purchasers and prospective buyers, and testing the HEVC Accused Products, and/or providing technical support or services for these products to these purchasers in the United States. *See, e.g.,* https://www.tiktok.com/support (TikTok Support); https://www.tiktok .com/safety/en/tools-and-guides/new-user-guide (TikTok User Guide); https://www.capcut.com/h elp (CapCut Help & Support); https://www.capcut.com/resource/capcut-tutorial-for-beginners (CapCut Tutorial for Beginners); https://www.byteplus.com/en/product/tos (advertising BytePlus Torch Object Storage); https://www.byteplus.com/en/product/rtc (offering BytePlus RTC demos); https://docs.byteplus.com/en/docs/byteplus-rtc/docs-1163794 (same); https://docs.byteplus.com/e n/docs/byteplus-rtc/docs-69865 (BytePlus RTC quick start guide); https://www.byteplus.com/en/p roduct/vod (offering BytePlus Video on Demand demos); https://docs.byteplus.com/en/docs/bytep lus-vod/docs-getting-started (BytePlus Video on Demand quick start guide); https://www.byteplus .com/en/product/medialive (offering BytePlus MediaLive demos); https://docs.byteplus.com/en/d ocs/byteplus-media-live/docs-getting-started (BytePlus MediaLive quick start guide). For

example, ByteDance configures, designs, offers to sell, and sells the HEVC Accused Products and such HEVC Accused Products contain specific instructions, such as source code and configuration files, that cause such products to infringe the '401 Patent. For example, the instructions such as source code and configuration files of the HEVC Accused Products comprise an image decoding device that infringe the '401 Patent.

105.    In the alternative, on information and belief, since at least the above-mentioned date when ByteDance was on notice of its infringement, ByteDance has contributorily infringed, under 35 U.S.C. § 271(c), one or more claims of the '401 Patent. For example, ByteDance contributes to the direct infringement of such claims by distributors, customers, subsidiaries, importers, and/or consumers that use, import, purchase, or sell the HEVC Accused Products. To the extent that the HEVC Accused Products do not directly infringe one or more claims of the '401 Patent, such products comprise components that are especially made and adapted for use in the HEVC Accused Products. Such components are specifically designed to comprise the infringing HEVC Accused Products and are a material part of the invention of the '401 Patent and are not a staple article of commerce suitable for substantial non-infringing use. For example, the HEVC Accused Products comprise a stream divider and a plurality of image decoders, components that are not generic and are especially made and specifically adapted to process an input bit stream containing encoded data that infringes the '401 Patent. Further, the stream divider and plurality of image decoders are core components that inherently infringe the '401 Patent and lack any substantial non-infringing use.

*Damages*

106.    On information and belief, despite having knowledge of the '401 Patent and knowledge that it is directly and/or indirectly infringing one or more claims of the '401 Patent,

PLAINTIFF'S ORIGINAL COMPLAINT               62

ByteDance has nevertheless continued its infringing conduct and disregarded an objectively high likelihood of infringement. ByteDance's infringing activities relative to the '401 Patent have been, and continue to be, willful, wanton, malicious, in bad-faith, deliberate, consciously wrongful, flagrant, and an egregious case of misconduct beyond typical infringement such that Plaintiff is entitled under 35 U.S.C. § 284 to enhanced damages up to three times the amount found or assessed.

107.   Plaintiff has been damaged as a result of ByteDance's infringing conduct described in this Count. ByteDance is, thus, liable to Plaintiff in an amount that adequately compensates Plaintiff for ByteDance's infringements, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

## COUNT V

### (INFRINGEMENT OF U.S. PATENT NO. 9,414,059)

108.   Plaintiff incorporates the preceding paragraphs herein by reference.

109.   This cause of action arises under the patent laws of the United States, and, in particular, 35 U.S.C. §§ 271, *et seq*.

110.   Plaintiff is the owner of all substantial rights, title, and interest in and to the '059 Patent including the right to exclude others and to enforce, sue, and recover damages for past infringements.

111.   The '059 Patent is valid, enforceable, and was duly and legally issued by the United States Patent and Trademark Office on August 9, 2016, after full and fair examination.

112.   ByteDance has directly and/or indirectly infringed one or more claims of the '059 Patent in this District and elsewhere in Texas and the United States by making, offering to sell, selling, testing, using, and/or importing ByteDance products, their components and processes,

and/or products containing the same that incorporate the fundamental technologies covered by the '059 Patent, including, but not limited to, the HEVC Accused Products.

***Direct Infringement (35 U.S.C. § 271(a))***

113.    ByteDance has directly infringed one or more claims of the '059 Patent in this District and elsewhere in Texas and the United States.

114.    ByteDance has directly infringed, either by itself or via its agent(s), at least claim 1 of the '059 Patent as set forth under 35 U.S.C. § 271(a) by making, offering to sell, selling, testing, and/or using the HEVC Accused Products.

115.     By way of illustration only, the HEVC Accused Products comprise each and every element of claim 1 of the '059 Patent. To the extent the preamble is limiting, the HEVC Accused Products comprise "[a]n image processing device which performs plural first processes, by pipelining, on a coded stream obtained by dividing an image into plural coding unit blocks according to at least two numbers of pixels and coding the image on a coding unit block-by-block basis." For example, each HEVC Accused Product comprises an image processing device configured to perform multi-core video encoding and decoding. The multi-core video encoding and decoding uses pipelined coding operations wherein the output of a coding process is used as the input for a subsequent coding process. The HEVC Accused Products are configured to support HEVC (H.265), which standardizes video coding processes for pipelining a coded stream consisting of coding unit blocks and coding the image on a block-by-block basis. A coding unit block comprises arrays of samples (individual pixel data) that are used to code an image. The HEVC Accused Products are therefore configured to code the image on a coding unit block-by-block basis because an image is partitioned into multiple coding units for coding.

### 0.3    Purpose

This Recommendation | International Standard was developed in response to the growing need for higher compression of moving pictures for various applications such as videoconferencing, digital storage media, television broadcasting, internet streaming, and communications. It is also designed to enable the use of the coded video representation in a flexible manner for a wide variety of network environments as well as to enable the use of multi-core parallel encoding and decoding devices. The use of this Recommendation | International Standard allows motion video to be manipulated as a form of computer data and to be stored on various storage media, transmitted and received over existing and future networks and distributed on existing and future broadcasting channels. Supports for higher bit depths and enhanced chroma formats, including the use of full-resolution chroma are provided. Support for scalability enables video transmission on networks with varying transmission conditions and other scenarios involving multiple bit rate services. Support for multiview enables representation of video content with multiple camera views and optional auxiliary information. Support for 3D enables joint representation of video content and depth information with multiple camera views.

Source: https://www.itu.int/rec/T-REC-H.265/en



Fig. 1: General diagram of HEVC decoder

Source: https://www.researchgate.net/publication/235760245
_Parallel_video_decoding_in_the_emerging_HEVC_standard



Fig. 3.4   Example for the partitioning of a 64 × 64 coding tree unit (CTU) into coding units (CUs) of 8 × 8 to 32 × 32 luma samples. The partitioning can be described by a quadtree, also referred to as coding tree, which is shown on the *right*. The numbers indicate the coding order of the CUs

Source: https://www.researchgate.net/publication/300315241
_Block_Structures_and_Parallelism_Features_in_HEVC

**coding tree block (CTB)**: An NxN *block* of samples for some value of N such that the division of a *component* into *CTBs* is a *partitioning*.

**coding tree unit (CTU)**: A *CTB* of *luma* samples, two corresponding *CTBs* of *chroma* samples of a *picture* that has three sample arrays, or a *CTB* of samples of a monochrome *picture* or a *picture* that is coded using three separate colour planes and *syntax structures* used to code the samples.

**coding unit**: A *coding block* of *luma* samples, two corresponding *coding blocks* of *chroma* samples of a *picture* that has three sample arrays, or a *coding block* of samples of a monochrome *picture* or a *picture* that is coded using three separate colour planes and *syntax structures* used to code the samples.

Source: https://www.itu.int/rec/T-REC-H.265/en (emphasis added)

HEVC uses a different coded block structure as compare with H.264/AVC. Specifically, HEVC uses larger blocks compare to H.264/AVC. The largest coding unit (LCU) is 64x64 pixels which is 16 times larger than the 16x16 pixel macroblock in H.264/AVC. Using a large coding unit helps to improve coding efficiency, particularly for high resolutions where many pixels may share the same characteristic. Furthermore, the largest coding unit can be divided into smaller coding units using a quad tree structure as shown in Figure 7. A split flag is transmitted to signal whether a CU should be divided into four smaller CUs. The smallest coding unit (SCU) allowed in HEVC is 8x8 pixels. An additional feature in HEVC is that within an LCU, there can be a mixture of inter and intra coding units. The coding units can be further divided into prediction units (PU). The PU within a coding unit will undergo the same form of prediction (either all inter or all intra). The PU sizes within a CU depend on whether the CU is inter or intra predicted.

Source: https://www.researchgate.net/publication/2564920
55_Parallel_Tools_in_HEVC_for_High-Throughput_Processing

116.    The HEVC Accused Products comprise "plural first process units configured to perform, by the pipelining, the plural first processes on the coded stream by each executing one of the plural first processes." For example, on information and belief, the HEVC Accused Products comprise multiple distinct decoding units configured to perform decoding processes including inter/intra prediction (as described by Sections 8.4 and 8.5 of the H.265 Standard), reconstruction processes (as described by Section 8.6 of the H.265 Standard), and in-loop filtering (as described by Section 8.7 of the H.265 Standard). These processes are applied to coding units of the coded stream and exhibit defined data dependencies, such that later processes operate on the outputs of earlier processes. On information and belief, the HEVC Accused Products are configured such that the processes are performed in an overlapping manner (e.g., while reconstruction is being performed for one coding unit, prediction and transform-related processing may be performed for another coding unit).

PLAINTIFF'S ORIGINAL COMPLAINT                66

| | |
|---|---|
| **8.4** | **Decoding process for coding units coded in intra prediction mode** |
| **8.5** | **Decoding process for coding units coded in inter prediction mode** |
| **8.6** | **Scaling, transformation and array construction process prior to deblocking filter process** |
| **8.7** | **In-loop filter process** |

Source: https://www.itu.int/rec/T-REC-H.265/en

117.    The HEVC Accused Products comprise "a control unit configured to divide or connect portions of the coded stream into plural first processing unit blocks according to a first number of pixels, each of the first processing unit blocks having the same number of pixels in the image, and control the plural first process units to cause the plural first processes to be executed for each of the first processing unit blocks." The HEVC Accused Products comprise a control unit configured to (i) divide the coded stream into image frames that are further partitioned into square CTUs, all of the same size $2^N$ where N = {4, 5, 6}, $2^N \times 2^N$ and is the first number of pixels and (ii) execute the plural first processes for each of the CTUs in each image frame of the coded stream. For example, for each picture (e.g., CurrPic), the plural first process units will execute the plural first processes for each of the CTUs.



Fig. 2: Block diagram of the CABAC decoder for HEVC. Black-filled blocks represent the stage registers used for pipelining.

Source: https://www.researchgate.net/publication/267868271_A_deeply_p
ipelined_CABAC_decoder_for_HEVC_supporting_level_62_high-tier_applications

As already mentioned, in HEVC, each picture is partitioned into square-shaped coding tree blocks (CTBs) such that the resulting number of CTBs is identical for both the luma and chroma picture components (assuming a non-monochrome video format).[2] Consequently, each CTB of luma samples together with its two corresponding CTBs of chroma samples and the syntax associated with these sample blocks is subsumed under a so-called coding tree unit (CTU). A CTU represents the basic processing unit in HEVC and is in that regard similar to the concept of a macroblock in prior video coding standards. The luma CTB covers a square picture area of $2^N \times 2^N$ luma samples. In the 4:2:0 chroma sampling format, each of the two chroma CTBs covers the corresponding area of $2^{N-1} \times 2^{N-1}$ chroma samples of one of the two chroma components. The parameter $N$ is transmitted in the sequence parameter set and can be chosen by the encoder among the values $N = 4, 5,$ and 6, corresponding to CTU sizes of $16 \times 16$, $32 \times 32$, and $64 \times 64$ luma samples. Larger CTU sizes[5] typically provide better coding efficiency, but may also increase the encoder/decoder delay, the memory requirements, and the computational complexity of the encoder process. The encoder has the freedom to choose the CTU size that provides the best trade-off for the targeted application.

Source: https://www.researchgate.net/publication/300315241_Bloc k_Structures_and_Parallelism_Features_in_HEVC



**Fig. 3.2** Illustration of the partitioning of a picture with $1280 \times 720$ luma samples into macro-blocks and coding tree units: (**a**) Partitioning of the picture into $16 \times 16$ macroblocks as found in all prior video coding standards of the ITU-T and ISO/IEC; (**b**) Partitioning of the picture into $64 \times 64$ coding tree units, the largest coding tree unit size supported in the Main profile of HEVC

Source: https://www.researchgate.net/publication/300315241_Bloc k_Structures_and_Parallelism_Features_in_HEVC

The decoding process operates as follows for the current picture CurrPic:

1. The decoding of NAL units is specified in clause 8.2.

2. The processes in clause 8.3 specify the following decoding processes using syntax elements in the slice segment layer and above:

   – Variables and functions relating to picture order count are derived as specified in clause 8.3.1. This needs to be invoked only for the first slice segment of a picture.

   – The decoding process for RPS in clause 8.3.2 is invoked, wherein reference pictures may be marked as "unused for reference" or "used for long-term reference". This needs to be invoked only for the first slice segment of a picture.

   – A picture storage buffer in the DPB is allocated for storage of the decoded sample values of the current picture after the invocation of the in-loop filter process as specified in clause 8.7. This version of the current decoded picture is referred to as the current decoded picture after the invocation of the in-loop filter process. When TwoVersionsOfCurrDecPicFlag is equal to 0 and pps_curr_pic_ref_enabled_flag is equal to 1, this picture storage buffer is marked as "used for long-term reference". When TwoVersionsOfCurrDecPicFlag is equal to 1, another picture storage buffer in the DPB is allocated for storage of the decoded sample values of the current picture immediately before the invocation of the in-loop filter process as specified in clause 8.7, and is marked as "used for long-term reference". This version of the current decoded picture is referred to as the current decoded picture before the invocation of the in-loop filter process. This needs to be invoked only for the first slice segment of a picture.

     NOTE 2 – When TwoVersionsOfCurrDecPicFlag is equal to 0, there is only one version of the current decoded picture. In this case, if pps_curr_pic_ref_enabled_flag is equal to 1, the current decoded picture is marked as "used for long-term reference" during the decoding of the current picture and will be marked as "used for short-term reference" at the end of the decoding of the current picture, otherwise it is not marked at all during the decoding of the current picture and will be marked as "used for short-term reference" at the end of the decoding of the current picture. When TwoVersionsOfCurrDecPicFlag is equal to 1, there are two versions of the current decoded picture, one of which is marked as "used for long-term reference" during the decoding of the current picture and will be marked as "unused for reference" at the end of the decoding of the current picture, and the other version is not marked at all during the decoding of the current picture and will be marked as "used for short-term reference" at the end of the decoding of the current picture.

   – When the current picture is a BLA picture or is a CRA picture with NoRaslOutputFlag equal to 1, the decoding process for generating unavailable reference pictures specified in clause 8.3.3 is invoked, which needs to be invoked only for the first slice segment of a picture.

   – PicOutputFlag is set as follows:

     – If the current picture is a RASL picture and NoRaslOutputFlag of the associated IRAP picture is equal to 1, PicOutputFlag is set equal to 0.

     – Otherwise, PicOutputFlag is set equal to pic_output_flag.

   – At the beginning of the decoding process for each P or B slice, the decoding process for reference picture lists construction specified in clause 8.3.4 is invoked for derivation of reference picture list 0 (RefPicList0) and, when decoding a B slice, reference picture list 1 (RefPicList1), and the decoding process for collocated picture and no backward prediction flag specified in clause 8.3.5 is invoked for derivation of the variables ColPic and NoBackwardPredFlag.

3. The processes in clauses 8.4, 8.5, 8.6 and 8.7 specify decoding processes using syntax elements in all syntax structure layers. It is a requirement of bitstream conformance that the coded slices of the picture shall contain slice segment data for every CTU of the picture, such that the division of the picture into slices, the division of the slices into slice segments and the division of the slice segments into CTUs each forms a partitioning of the picture.

4. After all slices of the current picture have been decoded, the current decoded picture after the invocation of the in-loop filter process as specified in clause 8.7 is marked as "used for short-term reference". When TwoVersionsOfCurrDecPicFlag is equal to 1, the current decoded picture before the invocation of the in-loop filter process as specified in clause 8.7 is marked as "unused for reference".

Source: https://www.itu.int/rec/T-REC-H.265/en

***Indirect Infringement (35 U.S.C. §§ 271(b), (c))***

118.    At a minimum, ByteDance has known of the '059 Patent at least as early as the filing date of this Original Complaint. In addition, ByteDance has known about the '059 Patent since at least July 3, 2025, when ByteDance received Plaintiff's correspondence via FedEx.

Moreover, ByteDance has known of the '059 Patent and Plaintiff's theories of infringement prior to this Original Complaint being filed, as described in the foregoing. *Supra* ¶¶ 21-24.

119.    On information and belief, since at least the above-mentioned date when ByteDance was on notice of its infringement, ByteDance has actively induced, under 35 U.S.C. § 271(b), its distributors, customers, subsidiaries, importers, and/or consumers that import, purchase, or sell the HEVC Accused Products that include or are made using all of the limitations of one or more claims of the '059 Patent to directly infringe one or more claims of the '059 Patent (e.g., claim 1, as discussed above) by using, offering for sale, selling, and/or importing the HEVC Accused Products. Since at least the notice provided on the above-mentioned date, ByteDance does so with knowledge, or with willful blindness of the fact, that the induced acts constitute infringement of the '059 Patent. ByteDance intends to cause, and has taken affirmative steps to induce infringement by its distributors, importers, customers, subsidiaries, and/or consumers by at least, inter alia, creating advertisements that promote the infringing use of the HEVC Accused Products, creating and/or maintaining established distribution channels for the HEVC Accused Products into and within the United States, manufacturing the HEVC Accused Products in conformity with U.S. laws and regulations, distributing or making available instructions or manuals for these products to purchasers and prospective buyers, and testing the HEVC Accused Products, and/or providing technical support or services for these products to these purchasers in the United States. *See, e.g.,* https://www.tiktok.com/support (TikTok Support); https://www.tiktok .com/safety/en/tools-and-guides/new-user-guide (TikTok User Guide); https://www.capcut.com/h elp (CapCut Help & Support); https://www.capcut.com/resource/capcut-tutorial-for-beginners (CapCut Tutorial for Beginners); https://www.byteplus.com/en/product/tos (advertising BytePlus Torch Object Storage); https://www.byteplus.com/en/product/rtc (offering BytePlus RTC demos);

https://docs.byteplus.com/en/docs/byteplus-rtc/docs-1163794 (same); https://docs.byteplus.com/en/docs/byteplus-rtc/docs-69865 (BytePlus RTC quick start guide); https://www.byteplus.com/en/product/vod (offering BytePlus Video on Demand demos); https://docs.byteplus.com/en/docs/byteplus-vod/docs-getting-started (BytePlus Video on Demand quick start guide); https://www.byteplus.com/en/product/medialive (offering BytePlus MediaLive demos); https://docs.byteplus.com/en/docs/byteplus-media-live/docs-getting-started (BytePlus MediaLive quick start guide). For example, ByteDance configures, designs, offers to sell, and sells the HEVC Accused Products and such HEVC Accused Products contain specific instructions, such as source code and configuration files, that cause such products to infringe the '059 Patent. For example, the instructions such as source code and configuration files of the HEVC Accused Products comprise an image processing device that infringes the '059 Patent.

120.    In the alternative, on information and belief, since at least the above-mentioned date when ByteDance was on notice of its infringement, ByteDance has contributorily infringed, under 35 U.S.C. § 271(c), one or more claims of the '059 Patent. For example, ByteDance contributes to the direct infringement of such claims by distributors, customers, subsidiaries, importers, and/or consumers that use, import, purchase, or sell the HEVC Accused Products. To the extent that the HEVC Accused Products do not directly infringe one or more claims of the '059 Patent, such products comprise components that are especially made and adapted for use in the HEVC Accused Products. Such components are specifically designed to comprise the infringing HEVC Accused Products and are a material part of the invention of the '059 Patent and are not a staple article of commerce suitable for substantial non-infringing use. For example, the HEVC Accused Products comprise plural first process units and control units, components that are not generic and are especially made and specifically adapted to perform plural first processes, by pipelining, on a

coded stream obtained by dividing an image into plural coding unit blocks according to at least two numbers of pixels and coding the image on a coding unit block-by-block basis that infringes the '059 Patent. Further, the plural first process units and control units are core components that inherently infringe the '059 Patent and lack any substantial non-infringing use.

*Damages*

121. On information and belief, despite having knowledge of the '059 Patent and knowledge that it is directly and/or indirectly infringing one or more claims of the '059 Patent, ByteDance has nevertheless continued its infringing conduct and disregarded an objectively high likelihood of infringement. ByteDance's infringing activities relative to the '059 Patent have been, and continue to be, willful, wanton, malicious, in bad-faith, deliberate, consciously wrongful, flagrant, and an egregious case of misconduct beyond typical infringement such that Plaintiff is entitled under 35 U.S.C. § 284 to enhanced damages up to three times the amount found or assessed.

122. Plaintiff has been damaged as a result of ByteDance's infringing conduct described in this Count. ByteDance is, thus, liable to Plaintiff in an amount that adequately compensates Plaintiff for ByteDance's infringements, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

## COUNT VI

### (INFRINGEMENT OF U.S. PATENT NO. 8,902,871)

123. Plaintiff incorporates the preceding paragraphs herein by reference.

124. This cause of action arises under the patent laws of the United States, and, in particular, 35 U.S.C. §§ 271, *et seq*.

125. Plaintiff is the owner of all substantial rights, title, and interest in and to the '871 Patent including the right to exclude others and to enforce, sue, and recover damages for past infringements.

126. The '871 Patent is valid, enforceable, and was duly and legally issued by the United States Patent and Trademark Office on December 2, 2014, after full and fair examination.

127. ByteDance has directly and/or indirectly infringed one or more claims of the '871 Patent in this District and elsewhere in Texas and the United States by making, offering to sell, selling, testing, using, and/or importing ByteDance products, their components and processes, and/or products containing the same that incorporate the fundamental technologies covered by the '871 Patent, including, but not limited to, the Wi-Fi Direct Accused Products.

***Direct Infringement (35 U.S.C. § 271(a))***

128. ByteDance has directly infringed one or more claims of the '871 Patent in this District and elsewhere in Texas and the United States.

129. ByteDance has directly infringed, either by itself or via its agent(s), at least claim 1 of the '871 Patent as set forth under 35 U.S.C. § 271(a) by making, offering to sell, selling, testing, and/or using the Wi-Fi Direct Accused Products.

130. By way of illustration only, the Wi-Fi Direct Accused Products comprise each and every element of claim 1 of the '871 Patent. To the extent the preamble is limiting, the Wi-Fi Direct Accused Products comprise[7] "[a] wireless base station connected to a wireless communication terminal." For example, each Wi-Fi Direct Accused Product comprises a wireless

---

[7] For convenience, the allegations are expressed in the present tense. All statements are intended to apply to the Wi-Fi Direct Accused Products as they existed and operated during the relevant period, unless otherwise specified.

base station (one Wi-Fi Direct peer device) connected to a wireless communication terminal (another Wi-Fi Direct peer device).



Source: Wi-Fi Peer-to-Peer (P2P) Technical Specification Version 1.7, at 14-15



Source: Wi-Fi Peer-to-Peer (P2P) Technical Specification Version 1.7, at 168

131.    The Wi-Fi Direct Accused Products comprise "a wireless communication section that communicates with the wireless communication terminal in accordance with a predetermined communication method" and "a control section that controls the wireless communication section." For example, each Wi-Fi Direct Accused Product comprises a Wi-Fi module (e.g., a wireless communication section) that is configured to communicate with another Wi-Fi Direct peer device using Wi-Fi direct protocols. Further, each Wi-Fi Direct Accused Product comprises a Wi-Fi module processor (e.g., control section) configured to control the wireless communication section.



Source: Wi-Fi Peer-to-Peer (P2P) Technical Specification Version 1.7, at 168

132.    The Wi-Fi Direct Accused Products further comprise a control section that "controls the wireless communication section to establish a connection with the wireless communication terminal by using (i) a first connection which does not require an authentication procedure for connection with the wireless communication terminal, or (ii) a second connection which requires the authentication procedure for connection with the wireless communication terminal." For example, the Wi-Fi Direct Accused Products comprise a control section that is configured to communicate with another Wi-Fi Direct peer device via a connection without authentication and a connection with authentication.



Source: Wi-Fi Peer-to-Peer (P2P) Technical Specification Version 1.7, at 168

133.   The Wi-Fi Direct Accused Products comprise "a first wireless communication section that communicates with the wireless communication terminal in accordance with a first wireless communication method." For example, the Wi-Fi Direct Accused Products comprise an IEEE 802.11 portion of the Wi-Fi module (e.g., a first wireless communication section) configured to communicate with another Wi-Fi Direct peer device using protocol described by the IEEE 802.11 standard.



Source: Wi-Fi Peer-to-Peer (P2P) Technical Specification Version 1.7, at 168

### 3.2  P2P Group operation

P2P Group operation outside DMG closely resembles infrastructure BSS operation as defined in IEEE 802.11-2012 [1] with the P2P Group Owner assuming the role of the AP and the P2P Client assuming the role of the STA. The similarities and differences between infrastructure BSS and P2P Group operation outside DMG are described in this section.

Source: Wi-Fi Peer-to-Peer (P2P) Technical Specification Version 1.7, at 58

134.    The Wi-Fi Direct Accused Products comprise "a second wireless communication section that communicates with the wireless communication terminal in accordance with a second wireless communication method." For example, the Wi-Fi Direct Accused Products comprise a P2P portion of the Wi-Fi module (e.g., a second wireless communication section) configured to communicate with another Wi-Fi Direct peer device using P2P protocol described by the Wi-Fi Peer-to-Peer (P2P) Technical Specification.



Source: Wi-Fi Peer-to-Peer (P2P) Technical Specification Version 1.7, at 168

135.    The Wi-Fi Direct Accused Products further comprise a control section that, prior to the first wireless communication section starting communication with the wireless communication terminal, "controls the second wireless communication section, and transmits, to the wireless communication terminal, profile information that is necessary for the first wireless communication section to communicate with the wireless communication terminal." For example, the Wi-Fi Direct Accused Products comprise a control section configured to transmit to another Wi-Fi Direct peer device profile information such as operating channel attributes necessary for the devices to communicate via protocol described by the IEEE 802.11 standard.



Source: Wi-Fi Peer-to-Peer (P2P) Technical Specification Version 1.7, at 168



### 3.1.4.2  Group Owner Negotiation

Group Owner Negotiation is a three way frame exchange used to agree which P2P Device shall become P2P Group Owner and to agree on characteristics of the P2P Group, as illustrated in Figure 11. The details of those three frames are described in the following sections.

**Figure 11—Group Owner Negotiation message exchange**

Source: Wi-Fi Peer-to-Peer (P2P) Technical Specification Version 1.7, at 47

### 3.1.4.2.2 GO Negotiation Response

The P2P Device receiving a GO Negotiation Request frame shall examine the received information and respond with a GO Negotiation Response frame.

Source: Wi-Fi Peer-to-Peer (P2P) Technical Specification Version 1.7, at 49

> A P2P Device that will become the P2P Group Owner constructs the GO Negotiation Response frame corresponding to the following rules. The Channel List attribute shall indicate the channels that the P2P Device may use as Operating Channel of the P2P Group. The channels indicated in the Channel List shall only include channels from the Channel List attribute in the GO Negotiation Request frame. The Operating Channel attribute shall indicate the intended Operating Channel of the P2P Group. The channel indicated in the Operating Channel attribute shall be one of the channels in the Channel List attribute in the GO Negotiation Response frame. The P2P Group ID attribute shall contain the intended SSID of the P2P Group. The Group Capability Bitmap field in the P2P Capability attribute shall indicate the characteristics of the P2P Group to be formed. The Persistent P2P Group, Intra-BSS Distribution, Cross Connection and Persistent Reconnect bits in the Group Capability Bitmap field in the P2P Capability attribute in Beacon and Probe Response frames transmitted by the P2P Group Owner of the P2P Group formed, shall be the same as within the Group Capability Bitmap field in the P2P Capability attribute in the GO Negotiation Response frame.

Source: Wi-Fi Peer-to-Peer (P2P) Technical Specification Version 1.7, at 50

***Indirect Infringement (35 U.S.C. §§ 271(b), (c))***

136.    At a minimum, ByteDance has known of the '871 Patent at least as early as the filing date of this Original Complaint. In addition, ByteDance has known about the '871 Patent since at least July 3, 2025, when ByteDance received Plaintiff's correspondence via FedEx. Moreover, ByteDance has known of the '871 Patent and Plaintiff's theories of infringement prior to this Original Complaint being filed, as described in the foregoing. *Supra* ¶¶ 21-24.

137.    On information and belief, since at least the above-mentioned date when ByteDance was on notice of its infringement, ByteDance has actively induced, under 35 U.S.C. § 271(b), its distributors, customers, subsidiaries, importers, and/or consumers that import, purchase, or sell the Wi-Fi Direct Accused Products that include or are made using all of the limitations of one or more claims of the '871 Patent to directly infringe one or more claims of the '871 Patent (e.g., claim 1, as discussed above) by using, offering for sale, selling, and/or importing the Wi-Fi

Direct Accused Products. Since at least the notice provided on the above-mentioned date, ByteDance does so with knowledge, or with willful blindness of the fact, that the induced acts constitute infringement of the '871 Patent. ByteDance intends to cause, and has taken affirmative steps to induce infringement by its distributors, importers, customers, subsidiaries, and/or consumers by at least, inter alia, creating advertisements that promote the infringing use of the Wi-Fi Direct Accused Products, creating and/or maintaining established distribution channels for the Wi-Fi Direct Accused Products into and within the United States, manufacturing the Wi-Fi Direct Accused Products in conformity with U.S. laws and regulations, distributing or making available instructions or manuals for these products to purchasers and prospective buyers, and testing the Wi-Fi Direct Accused Products, and/or providing technical support or services for these products to these purchasers in the United States. *See, e.g.,* https://www.picoxr.com/global/support (providing "Pico Help," "FAQs," and "Product Support" for the Wi-Fi Direct Accused Products); https://www.picoxr.com/global/products/pico4 (advertising Pico 4); https://p16-platform-static-va.ibyteimg.com/tos-maliva-i-jo6vmmv194-us/ae723dcf5efe77849bb06a1cdd4ee77b.pdf (Pico 4 User Guide); https://www.picoxr.com/global/products/neo3-enterprise (advertising Pico Neo3). For example, ByteDance configures, designs, offers to sell, and sells the Wi-Fi Direct Accused Products and such Wi-Fi Direct Accused Products contain specific instructions, such as source code and configuration files, that cause such products to infringe the '871 Patent. For example, the instructions such as source code and configuration files of the Wi-Fi Direct Accused Products comprise a wireless base station connected to a wireless communication terminal that infringes the '871 Patent.

138.     In the alternative, on information and belief, since at least the above-mentioned date when ByteDance was on notice of its infringement, ByteDance has contributorily infringed, under

35 U.S.C. § 271(c), one or more claims of the '871 Patent. For example, ByteDance contributes to the direct infringement of such claims by distributors, customers, subsidiaries, importers, and/or consumers that use, import, purchase, or sell the Wi-Fi Direct Accused Products. To the extent that the Wi-Fi Direct Accused Products do not directly infringe one or more claims of the '871 Patent, such products comprise components that are especially made and adapted for use in the Wi-Fi Direct Accused Products. Such components are specifically designed to comprise the infringing Wi-Fi Direct Accused Products and are a material part of the invention of the '871 Patent and are not a staple article of commerce suitable for substantial non-infringing use. For example, the Wi-Fi Direct Accused Products comprise a control section, a component that is not generic and is especially made and specifically adapted to establish a connection with the wireless communication terminal via two connections (one that does not require an authentication procedure and one that does require an authentication procedure) that infringe the '871 Patent. Further, the control section is a core component that inherently infringes the '871 Patent and lacks any substantial non-infringing use.

### Damages

139.    On information and belief, despite having knowledge of the '871 Patent and knowledge that it is directly and/or indirectly infringing one or more claims of the '871 Patent, ByteDance has nevertheless continued its infringing conduct and disregarded an objectively high likelihood of infringement. ByteDance's infringing activities relative to the '871 Patent have been, and continue to be, willful, wanton, malicious, in bad-faith, deliberate, consciously wrongful, flagrant, and an egregious case of misconduct beyond typical infringement such that Plaintiff is entitled under 35 U.S.C. § 284 to enhanced damages up to three times the amount found or assessed.

140.    Plaintiff has been damaged as a result of ByteDance's infringing conduct described in this Count. ByteDance is, thus, liable to Plaintiff in an amount that adequately compensates Plaintiff for ByteDance's infringements, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

## COUNT VII

### (INFRINGEMENT OF U.S. PATENT NO. 9,357,441)

141.    Plaintiff incorporates the preceding paragraphs herein by reference.

142.    This cause of action arises under the patent laws of the United States, and, in particular, 35 U.S.C. §§ 271, *et seq*.

143.    Plaintiff is the owner of all substantial rights, title, and interest in and to the '441 Patent including the right to exclude others and to enforce, sue, and recover damages for past infringements.

144.    The '441 Patent is valid, enforceable, and was duly and legally issued by the United States Patent and Trademark Office on May 31, 2016, after full and fair examination.

145.    ByteDance has directly and/or indirectly infringed one or more claims of the '441 Patent in this District and elsewhere in Texas and the United States by making, offering to sell, selling, testing, using, and/or importing ByteDance products, their components and processes, and/or products containing the same that incorporate the fundamental technologies covered by the '441 Patent, including, but not limited to, the Wi-Fi Direct Accused Products.

***Direct Infringement (35 U.S.C. § 271(a))***

146.    ByteDance has directly infringed one or more claims of the '441 Patent in this District and elsewhere in Texas and the United States.

147.    ByteDance has directly infringed, either by itself or via its agent(s), at least claim 1 of the '441 Patent as set forth under 35 U.S.C. § 271(a) by making, offering to sell, selling, testing, and/or using the Wi-Fi Direct Accused Products.

148.    By way of illustration only, the Wi-Fi Direct Accused Products comprise each and every element of claim 1 of the '441 Patent. To the extent the preamble is limiting, the Wi-Fi Direct Accused Products comprise "[a] wireless communication terminal." For example, each Wi-Fi Direct Accused Product comprises a wireless communication terminal (one Wi-Fi Direct peer device) connected to a wireless base station (another Wi-Fi Direct peer device).

**1.4    Definitions**

The following definitions and terms are used in this document:

**P2P Device**: Wi-Fi P2P device that is capable of acting as both a P2P Group Owner and a P2P Client.

**P2P Client**: A P2P Device that is connected to a P2P Group Owner.

**P2P Group Owner**: An "AP-like" entity, when not operating within DMG, or PCP, when operating within DMG, that may provide and use connectivity between Clients.

Source: Wi-Fi Peer-to-Peer (P2P) Technical Specification Version 1.7, at 14-15



Source: Wi-Fi Peer-to-Peer (P2P) Technical Specification Version 1.7, at 168

149.    The Wi-Fi Direct Accused Products comprise "wireless communication circuitry operative to communicate with a wireless base station by using (i) a non-authentication connection which does not require an authentication procedure for connection with the wireless base station, or (ii) an authentication connection which requires the authentication procedure for connection with the wireless base station." For example, the Wi-Fi Direct Accused Products comprise wireless communication circuitry operative to communicate with another Wi-Fi Direct peer device via a connection without authentication and a connection with authentication.



Source: Wi-Fi Peer-to-Peer (P2P) Technical Specification Version 1.7, at 168

150.    The Wi-Fi Direct Accused Products comprise "control circuitry operative to receive, by using the wireless communication circuitry, communication channel information from the wireless base station with a first communication method prior to the authentication connection starting with a second communication method, the communication channel information being necessary for the second communication method to select a communication channel for communicating with the wireless base station." For example, the Wi-Fi Direct Accused Products comprise control circuitry operative to receive from the wireless base station (e.g., another Wi-Fi Direct peer device), via the connection without authentication, profile information (e.g., a channel

list and operating channel attributes) necessary for the devices to communicate via the connection

with authentication.



Source: Wi-Fi Peer-to-Peer (P2P) Technical Specification Version 1.7, at 168

### 3.2    P2P Group operation

P2P Group operation outside DMG closely resembles infrastructure BSS operation as defined in IEEE 802.11-2012 [1] with the P2P Group Owner assuming the role of the AP and the P2P Client assuming the role of the STA. The similarities and differences between infrastructure BSS and P2P Group operation outside DMG are described in this section.

Source: Wi-Fi Peer-to-Peer (P2P) Technical Specification Version 1.7, at 58



Source: Wi-Fi Peer-to-Peer (P2P) Technical Specification Version 1.7, at 47

### 3.1.4.2.2 GO Negotiation Response

The P2P Device receiving a GO Negotiation Request frame shall examine the received information and respond with a GO Negotiation Response frame.

Source: Wi-Fi Peer-to-Peer (P2P) Technical Specification Version 1.7, at 49

A P2P Device that will become the P2P Group Owner constructs the GO Negotiation Response frame corresponding to the following rules. The Channel List attribute shall indicate the channels that the P2P Device may use as Operating Channel of the P2P Group. The channels indicated in the Channel List shall only include channels from the Channel List attribute in the GO Negotiation Request frame. The Operating Channel attribute shall indicate the intended Operating Channel of the P2P Group. The channel indicated in the Operating Channel attribute shall be one of the channels in the Channel List attribute in the GO Negotiation Response frame. The P2P Group ID attribute shall contain the intended SSID of the P2P Group. The Group Capability Bitmap field in the P2P Capability attribute shall indicate the characteristics of the P2P Group to be formed. The Persistent P2P Group, Intra-BSS Distribution, Cross Connection and Persistent Reconnect bits in the Group Capability Bitmap field in the P2P Capability attribute in Beacon and Probe Response frames transmitted by the P2P Group Owner of the P2P Group formed, shall be the same as within the Group Capability Bitmap field in the P2P Capability attribute in the GO Negotiation Response frame.

Source: Wi-Fi Peer-to-Peer (P2P) Technical Specification Version 1.7, at 50

*Indirect Infringement (35 U.S.C. §§ 271(b), (c))*

151.    At a minimum, ByteDance has known of the '441 Patent at least as early as the filing date of this Original Complaint. In addition, ByteDance has known about the '441 Patent since at least July 3, 2025, when ByteDance received Plaintiff's correspondence via FedEx. Moreover, ByteDance has known of the '441 Patent and Plaintiff's theories of infringement prior to this Original Complaint being filed, as described in the foregoing. *Supra* ¶¶ 21-24.

152.    On information and belief, since at least the above-mentioned date when ByteDance was on notice of its infringement, ByteDance has actively induced, under 35 U.S.C. § 271(b), its distributors, customers, subsidiaries, importers, and/or consumers that import, purchase, or sell the Wi-Fi Direct Accused Products that include or are made using all of the limitations of one or more claims of the '441 Patent to directly infringe one or more claims of the '441 Patent (e.g., claim 1, as discussed above) by using, offering for sale, selling, and/or importing the Wi-Fi Direct Accused Products. Since at least the notice provided on the above-mentioned date, ByteDance does so with knowledge, or with willful blindness of the fact, that the induced acts constitute infringement of the '441 Patent. ByteDance intends to cause, and has taken affirmative steps to induce infringement by its distributors, importers, customers, subsidiaries, and/or consumers by at least, inter alia, creating advertisements that promote the infringing use of the Wi-Fi Direct Accused Products, creating and/or maintaining established distribution channels for the Wi-Fi Direct Accused Products into and within the United States, manufacturing the Wi-Fi Direct Accused Products in conformity with U.S. laws and regulations, distributing or making available instructions or manuals for these products to purchasers and prospective buyers, and testing the Wi-Fi Direct Accused Products, and/or providing technical support or services for these products to these purchasers in the United States. *See, e.g.,* https://www.picoxr.com/global/support

PLAINTIFF'S ORIGINAL COMPLAINT                91

(providing "Pico Help," "FAQs," and "Product Support" for the Wi-Fi Direct Accused Products); https://www.picoxr.com/global/products/pico4 (advertising Pico 4); https://p16-platform-static-va.ibyteimg.com/tos-maliva-i-jo6vmmv194-us/ae723dcf5efe77849bb06a1cdd4ee77b.pdf (Pico 4 User Guide); https://www.picoxr.com/global/products/neo3-enterprise (advertising Pico Neo3). For example, ByteDance configures, designs, offers to sell, and sells the Wi-Fi Direct Accused Products and such Wi-Fi Direct Accused Products contain specific instructions, such as source code and configuration files, that cause such products to infringe the '441 Patent. For example, the instructions such as source code and configuration files of the Wi-Fi Direct Accused Products comprise a wireless communication terminal that infringes the '441 Patent.

153.    In the alternative, on information and belief, since at least the above-mentioned date when ByteDance was on notice of its infringement, ByteDance has contributorily infringed, under 35 U.S.C. § 271(c), one or more claims of the '441 Patent. For example, ByteDance contributes to the direct infringement of such claims by distributors, customers, subsidiaries, importers, and/or consumers that use, import, purchase, or sell the Wi-Fi Direct Accused Products. To the extent that the Wi-Fi Direct Accused Products do not directly infringe one or more claims of the '441 Patent, such products comprise components that are especially made and adapted for use in the Wi-Fi Direct Accused Products. Such components are specifically designed to comprise the infringing Wi-Fi Direct Accused Products and are a material part of the invention of the '441 Patent and are not a staple article of commerce suitable for substantial non-infringing use. For example, the Wi-Fi Direct Accused Products comprise a wireless communication circuitry, a component that is not generic and is especially made and specifically adapted to communicate with a wireless base station using a non-authentication connection and authentication connection that

PLAINTIFF'S ORIGINAL COMPLAINT                92

infringe the '441 Patent. Further, the wireless communication circuitry is a core component that inherently infringes the '441 Patent and lacks any substantial non-infringing use.

***Damages***

154.    On information and belief, despite having knowledge of the '441 Patent and knowledge that it is directly and/or indirectly infringing one or more claims of the '441 Patent, ByteDance has nevertheless continued its infringing conduct and disregarded an objectively high likelihood of infringement. ByteDance's infringing activities relative to the '441 Patent have been, and continue to be, willful, wanton, malicious, in bad-faith, deliberate, consciously wrongful, flagrant, and an egregious case of misconduct beyond typical infringement such that Plaintiff is entitled under 35 U.S.C. § 284 to enhanced damages up to three times the amount found or assessed.

155.    Plaintiff has been damaged as a result of ByteDance's infringing conduct described in this Count. ByteDance is, thus, liable to Plaintiff in an amount that adequately compensates Plaintiff for ByteDance's infringements, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

## COUNT VIII

### (INFRINGEMENT OF U.S. PATENT NO. 10,039,144)

156.    Plaintiff incorporates the preceding paragraphs herein by reference.

157.    This cause of action arises under the patent laws of the United States, and, in particular, 35 U.S.C. §§ 271, *et seq*.

158.    Plaintiff is the owner of all substantial rights, title, and interest in and to the '144 Patent including the right to exclude others and to enforce, sue, and recover damages for past infringements.

159.    The '144 Patent is valid, enforceable, and was duly and legally issued by the United States Patent and Trademark Office on July 31, 2018, after full and fair examination.

160.    ByteDance has directly and/or indirectly infringed one or more claims of the '144 Patent in this District and elsewhere in Texas and the United States by making, offering to sell, selling, testing, using, and/or importing ByteDance products, their components and processes, and/or products containing the same that incorporate the fundamental technologies covered by the '144 Patent, including, but not limited to, the Wi-Fi Direct Accused Products.

***Direct Infringement (35 U.S.C. § 271(a))***

161.    ByteDance has directly infringed one or more claims of the '144 Patent in this District and elsewhere in Texas and the United States.

162.    ByteDance has directly infringed, either by itself or via its agent(s), at least claim 1 of the '144 Patent as set forth under 35 U.S.C. § 271(a) by making, offering to sell, selling, testing, and/or using the Wi-Fi Direct Accused Products.

163.    By way of illustration only, the Wi-Fi Direct Accused Products comprise each and every element of claim 1 of the '144 Patent. To the extent the preamble is limiting, the Wi-Fi Direct Accused Products comprise "[a] wireless communication device." For example, each Wi-Fi Direct Accused Product comprises a wireless communication device (one Wi-Fi Direct peer device) connected to a wireless station (another Wi-Fi Direct peer device).

### 1.4    Definitions

The following definitions and terms are used in this document:

**P2P Device**: Wi-Fi P2P device that is capable of acting as both a P2P Group Owner and a P2P Client.

**P2P Client**: A P2P Device that is connected to a P2P Group Owner.

**P2P Group Owner**: An "AP-like" entity, when not operating within DMG, or PCP, when operating within DMG, that may provide and use connectivity between Clients.

Source: Wi-Fi Peer-to-Peer (P2P) Technical Specification Version 1.7, at 14-15



Source: Wi-Fi Peer-to-Peer (P2P) Technical Specification Version 1.7, at 168

164.    The Wi-Fi Direct Accused Products comprise "wireless communication circuitry operative to communicate with a wireless station by using (i) a non-authentication connection which does not require an authentication procedure for connection with the wireless station, or (ii)

an authentication connection which requires the authentication procedure for connection with the wireless station." For example, the Wi-Fi Direct Accused Products comprise wireless communication circuitry operative to communicate with another Wi-Fi Direct peer device via a connection without authentication and a connection with authentication.



Source: Wi-Fi Peer-to-Peer (P2P) Technical Specification Version 1.7, at 168

165.    The Wi-Fi Direct Accused Products comprise "control circuitry operative to receive, by using the wireless communication circuitry, profile information from the wireless station with a first communication method prior to the authentication connection starting with a second communication method, the profile information being necessary for the second communication method to communicate with the wireless station." For example, the Wi-Fi Direct

Accused Products comprise control circuitry operative to receive from the wireless station (e.g., another Wi-Fi Direct peer device), via the connection without authentication, profile information (e.g., a channel list and operating channel attributes) necessary for the devices to communicate via the connection with authentication.



Source: Wi-Fi Peer-to-Peer (P2P) Technical Specification Version 1.7, at 168



Source: Wi-Fi Peer-to-Peer (P2P) Technical Specification Version 1.7, at 47

### 3.1.4.2.2 GO Negotiation Response

The P2P Device receiving a GO Negotiation Request frame shall examine the received information and respond with a GO Negotiation Response frame.

Source: Wi-Fi Peer-to-Peer (P2P) Technical Specification Version 1.7, at 49

A P2P Device that will become the P2P Group Owner constructs the GO Negotiation Response frame corresponding to the following rules. The Channel List attribute shall indicate the channels that the P2P Device may use as Operating Channel of the P2P Group. The channels indicated in the Channel List shall only include channels from the Channel List attribute in the GO Negotiation Request frame. The Operating Channel attribute shall indicate the intended Operating Channel of the P2P Group. The channel indicated in the Operating Channel attribute shall be one of the channels in the Channel List attribute in the GO Negotiation Response frame. The P2P Group ID attribute shall contain the intended SSID of the P2P Group. The Group Capability Bitmap field in the P2P Capability attribute shall indicate the characteristics of the P2P Group to be formed. The Persistent P2P Group, Intra-BSS Distribution, Cross Connection and Persistent Reconnect bits in the Group Capability Bitmap field in the P2P Capability attribute in Beacon and Probe Response frames transmitted by the P2P Group Owner of the P2P Group formed, shall be the same as within the Group Capability Bitmap field in the P2P Capability attribute in the GO Negotiation Response frame.

PLAINTIFF'S ORIGINAL COMPLAINT                98

Source: Wi-Fi Peer-to-Peer (P2P) Technical Specification Version 1.7, at 50

166.    The Wi-Fi Direct Accused Products further comprise control circuitry that "is operative to control the wireless communication circuitry to receive a content with the second communication method." For example, the Wi-Fi Direct Accused Products comprise control circuitry operative to receive content (e.g., WSC Exchange data, such as a Device Password) via the connection with authentication.



Source: Wi-Fi Peer-to-Peer (P2P) Technical Specification Version 1.7, at 168

If a P2P Group Owner is transmitting the Invitation Request frame after NFC Static Handover, and intends to use the Device Password read from the NFC Tag in the subsequent WSC exchange, then it also shall include a WSC IE in its P2P Invitation Request and places the Device Password ID read from the NFC Tag in a Device Password ID attribute within the WSC IE.

Source: Wi-Fi Peer-to-Peer (P2P) Technical Specification Version 1.7, at 55-56

167.    The Wi-Fi Direct Accused Products further comprise control circuitry that "controls the wireless communication circuitry to receive information that is related to the content with the first communication method." For example, the Wi-Fi Direct Accused Products comprise control circuitry configured to receive information related to the content (e.g., WSC IE data, such as a Device Password ID) via the connection without authentication.



Source: Wi-Fi Peer-to-Peer (P2P) Technical Specification Version 1.7, at 168



Source: Wi-Fi Peer-to-Peer (P2P) Technical Specification Version 1.7, at 47

Source: Wi-Fi Peer-to-Peer (P2P) Technical Specification Version 1.7, at 125

***Indirect Infringement (35 U.S.C. §§ 271(b), (c))***

168.    At a minimum, ByteDance has known of the '144 Patent at least as early as the filing date of this Original Complaint. In addition, ByteDance has known about the '144 Patent since at least July 3, 2025, when ByteDance received Plaintiff's correspondence via FedEx. Moreover, ByteDance has known of the '144 Patent and Plaintiff's theories of infringement prior to this Original Complaint being filed, as described in the foregoing. *Supra* ¶¶ 21-24.

169.   On information and belief, since at least the above-mentioned date when ByteDance was on notice of its infringement, ByteDance has actively induced, under 35 U.S.C. § 271(b), its distributors, customers, subsidiaries, importers, and/or consumers that import, purchase, or sell the Wi-Fi Direct Accused Products that include or are made using all of the limitations of one or more claims of the '144 Patent to directly infringe one or more claims of the '144 Patent (e.g., claim 1, as discussed above) by using, offering for sale, selling, and/or importing the Wi-Fi Direct Accused Products. Since at least the notice provided on the above-mentioned date, ByteDance does so with knowledge, or with willful blindness of the fact, that the induced acts constitute infringement of the '144 Patent. ByteDance intends to cause, and has taken affirmative steps to induce infringement by its distributors, importers, customers, subsidiaries, and/or consumers by at least, inter alia, creating advertisements that promote the infringing use of the Wi-Fi Direct Accused Products, creating and/or maintaining established distribution channels for the Wi-Fi Direct Accused Products into and within the United States, manufacturing the Wi-Fi Direct Accused Products in conformity with U.S. laws and regulations, distributing or making available instructions or manuals for these products to purchasers and prospective buyers, and testing the Wi-Fi Direct Accused Products, and/or providing technical support or services for these products to these purchasers in the United States. *See, e.g.,* https://www.picoxr.com/global/support (providing "Pico Help," "FAQs," and "Product Support" for the Wi-Fi Direct Accused Products); https://www.picoxr.com/global/products/pico4 (advertising Pico 4); https://p16-platform-static-va.ibyteimg.com/tos-maliva-i-jo6vmmv194-us/ae723dcf5efe77849bb06a1cdd4ee77b.pdf (Pico 4 User Guide); https://www.picoxr.com/global/products/neo3-enterprise (advertising Pico Neo3). For example, ByteDance configures, designs, offers to sell, and sells the Wi-Fi Direct Accused Products and such Wi-Fi Direct Accused Products contain specific instructions, such as source

code and configuration files, that cause such products to infringe the '144 Patent. For example, the instructions such as source code and configuration files of the Wi-Fi Direct Accused Products comprise a wireless communication device that infringes the '144 Patent.

170.     In the alternative, on information and belief, since at least the above-mentioned date when ByteDance was on notice of its infringement, ByteDance has contributorily infringed, under 35 U.S.C. § 271(c), one or more claims of the '144 Patent. For example, ByteDance contributes to the direct infringement of such claims by distributors, customers, subsidiaries, importers, and/or consumers that use, import, purchase, or sell the Wi-Fi Direct Accused Products. To the extent that the Wi-Fi Direct Accused Products do not directly infringe one or more claims of the '144 Patent, such products comprise components that are especially made and adapted for use in the Wi-Fi Direct Accused Products. Such components are specifically designed to comprise the infringing Wi-Fi Direct Accused Products and are a material part of the invention of the '144 Patent and are not a staple article of commerce suitable for substantial non-infringing use. For example, the Wi-Fi Direct Accused Products comprise a wireless communication circuitry, a component that is not generic and is especially made and specifically adapted to communicate with a wireless station using a non-authentication connection and authentication connection that infringe the '144 Patent. Further, the wireless communication circuitry is a core component that inherently infringes the '144 Patent and lacks any substantial non-infringing use.

*Damages*

171.     On information and belief, despite having knowledge of the '144 Patent and knowledge that it is directly and/or indirectly infringing one or more claims of the '144 Patent, ByteDance has nevertheless continued its infringing conduct and disregarded an objectively high likelihood of infringement. ByteDance's infringing activities relative to the '144 Patent have been,

and continue to be, willful, wanton, malicious, in bad-faith, deliberate, consciously wrongful, flagrant, and an egregious case of misconduct beyond typical infringement such that Plaintiff is entitled under 35 U.S.C. § 284 to enhanced damages up to three times the amount found or assessed.

172.    Plaintiff has been damaged as a result of ByteDance's infringing conduct described in this Count. ByteDance is, thus, liable to Plaintiff in an amount that adequately compensates Plaintiff for ByteDance's infringements, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

## COUNT IX

### (INFRINGEMENT OF U.S. PATENT NO. 11,672,028)

173.    Plaintiff incorporates the preceding paragraphs herein by reference.

174.    This cause of action arises under the patent laws of the United States, and, in particular, 35 U.S.C. §§ 271, *et seq*.

175.    Plaintiff is the owner of all substantial rights, title, and interest in and to the '028 Patent including the right to exclude others and to enforce, sue, and recover damages for past infringements.

176.    The '028 Patent is valid, enforceable, and was duly and legally issued by the United States Patent and Trademark Office on June 6, 2023, after full and fair examination.

177.    ByteDance has directly and/or indirectly infringed one or more claims of the '028 Patent in this District and elsewhere in Texas and the United States by making, offering to sell, selling, testing, using, and/or importing ByteDance products, their components and processes, and/or products containing the same that incorporate the fundamental technologies covered by the '028 Patent, including, but not limited to, the Wi-Fi Direct Accused Products.

PLAINTIFF'S ORIGINAL COMPLAINT                    104

*Direct Infringement (35 U.S.C. § 271(a))*

178.    ByteDance has directly infringed one or more claims of the '028 Patent in this District and elsewhere in Texas and the United States.

179.    ByteDance has directly infringed, either by itself or via its agent(s), at least claim 1 of the '028 Patent as set forth under 35 U.S.C. § 271(a) by making, offering to sell, selling, testing, and/or using the Wi-Fi Direct Accused Products.

180.     By way of illustration only, the Wi-Fi Direct Accused Products comprise each and every element of claim 1 of the '028 Patent. To the extent the preamble is limiting, the Wi-Fi Direct Accused Products comprise "[a] wireless communication device." For example, each Wi-Fi Direct Accused Product comprises a wireless communication device (one Wi-Fi Direct peer device) connected to a wireless station (another Wi-Fi Direct peer device).

### 1.4    Definitions

The following definitions and terms are used in this document:

**P2P Device**: Wi-Fi P2P device that is capable of acting as both a P2P Group Owner and a P2P Client.

**P2P Client**: A P2P Device that is connected to a P2P Group Owner.

**P2P Group Owner**: An "AP-like" entity, when not operating within DMG, or PCP, when operating within DMG, that may provide and use connectivity between Clients.

Source: Wi-Fi Peer-to-Peer (P2P) Technical Specification Version 1.7, at 14-15



Source: Wi-Fi Peer-to-Peer (P2P) Technical Specification Version 1.7, at 168

181. The Wi-Fi Direct Accused Products comprise "wireless communication circuitry operative to communicate with a wireless station using a connection having a non-authenticated component and an authenticated component, wherein the non-authenticated component of the connection does not contain an authentication procedure including a challenge and response between the wireless communication device and the wireless station, and the authenticated component of the connection contains an authentication procedure including a challenge and response between the wireless communication device and the wireless station." For example, the Wi-Fi Direct Accused Products comprise wireless communication circuitry operative to communicate with another Wi-Fi Direct peer device via a connection without authentication and a connection with authentication.



Source: Wi-Fi Peer-to-Peer (P2P) Technical Specification Version 1.7, at 168

182.    The Wi-Fi Direct Accused Products comprise "control circuitry operative to control the wireless communication circuitry to receive from the wireless station, via the wireless communication circuitry and during the non-authenticated component of the connection prior to the authenticated component of the connection, information necessary for the authenticated component of the connection." For example, the Wi-Fi Direct Accused Products comprise control circuitry (e.g., a Wi-Fi module processor) operative to control the wireless communication circuitry. During an initial, non-authenticated component of the connection, the wireless communication circuitry is configured to receive information necessary for the authenticated component of the connection. In particular, the wireless communication circuitry is configured to receive information used to establish a subsequent authenticated connection.



Source: Wi-Fi Peer-to-Peer (P2P) Technical Specification Version 1.7, at 168

183. The Wi-Fi Direct Accused Products further comprise control circuitry that is "operative to control the wireless communication circuitry to receive content from the wireless station during the authenticated component of the connection, and to further control the wireless communication circuitry to receive additional information that is related to the content during the non-authenticated component of the connection." For example, the Wi-Fi Direct Accused Products comprise control circuitry operative to control the wireless communication circuitry such that it receives content from the wireless station during the authenticated component of the connection. The wireless communication circuitry also receives additional information (e.g., Device Password ID Attribute) that is related to the content (e.g., password) to be received during the authenticated component of the connection.



Source: Wi-Fi Peer-to-Peer (P2P) Technical Specification Version 1.7, at 168

### 3.1.4.2  Group Owner Negotiation

Group Owner Negotiation is a three way frame exchange used to agree which P2P Device shall become P2P Group Owner and to agree on characteristics of the P2P Group, as illustrated in Figure 11. The details of those three frames are described in the following sections.

P2P Device                                                                                      P2P Device

GO Negotiation Request
(The P2P IE includes P2P Capability, P2P Device Info, Group Owner Intent, Configuration Timeout, Listen Channel, Extended Listen Timing, Intended P2P Interface Address, Channel List, and Operating Channel attributes. The WSC IE includes Device Password ID attribute)

GO Negotiation Response
(The P2P IE includes P2P Capability, P2P Device Info, Group Owner Intent, Configuration Timeout, Intended P2P Interface Address, Channel List, and Operating Channel attributes. The WSC IE includes Device Password ID attribute)

GO Negotiation Confirmation
(The P2P IE includes P2P Capability, Status, Channel List, and Operating Channel attributes)

**Figure 11—Group Owner Negotiation message exchange**

Source: Wi-Fi Peer-to-Peer (P2P) Technical Specification Version 1.7, at 47

If a P2P Group Owner is transmitting the Invitation Request frame after NFC Static Handover, and intends to use the Device Password read from the NFC Tag in the subsequent WSC exchange, then it also shall include a WSC IE in its P2P Invitation Request and places the Device Password ID read from the NFC Tag in a Device Password ID attribute within the WSC IE.

Source: Wi-Fi Peer-to-Peer (P2P) Technical Specification Version 1.7, at 55-56

The WSC IE that is included in the GO Negotiation Response frame contains the Device Password ID and other attributes as shown in Table 65. The value of Device Password ID attribute shall be set to the specific configuration method that the P2P Device is currently using.

**Table 65—WSC IE in the GO Negotiation Response frame**

| Attribute | R/O | Allowed Values |
|---|---|---|
| Version | R | 0x10 = version1.0, 0x11 = version 1.1, etc. |
| Device Password ID | R | The value of Device Password ID attribute shall be set to the specific configuration method that the P2P Device is currently using. See Section 12 (Data Element Definitions) of the WSC Specification [2]. |
| <other...> | O | Multiple attributes are permitted. |

Source: Wi-Fi Peer-to-Peer (P2P) Technical Specification Version 1.7, at 125

***Indirect Infringement (35 U.S.C. §§ 271(b), (c))***

184.   At a minimum, ByteDance has known of the '028 Patent at least as early as the filing date of this Original Complaint. In addition, ByteDance has known about the '028 Patent since at least July 3, 2025, when ByteDance received Plaintiff's correspondence via FedEx. Moreover, ByteDance has known of the '028 Patent and Plaintiff's theories of infringement prior to this Original Complaint being filed, as described in the foregoing. *Supra* ¶¶ 21-24.

185.   On information and belief, since at least the above-mentioned date when ByteDance was on notice of its infringement, ByteDance has actively induced, under 35 U.S.C. § 271(b), its distributors, customers, subsidiaries, importers, and/or consumers that import, purchase, or sell the Wi-Fi Direct Accused Products that include or are made using all of the limitations of one or more claims of the '028 Patent to directly infringe one or more claims of the '028 Patent (e.g., claim 1, as discussed above) by using, offering for sale, selling, and/or importing the Wi-Fi Direct Accused Products. Since at least the notice provided on the above-mentioned date, ByteDance does so with knowledge, or with willful blindness of the fact, that the induced acts

PLAINTIFF'S ORIGINAL COMPLAINT             111

constitute infringement of the '028 Patent. ByteDance intends to cause, and has taken affirmative steps to induce infringement by its distributors, importers, customers, subsidiaries, and/or consumers by at least, inter alia, creating advertisements that promote the infringing use of the Wi-Fi Direct Accused Products, creating and/or maintaining established distribution channels for the Wi-Fi Direct Accused Products into and within the United States, manufacturing the Wi-Fi Direct Accused Products in conformity with U.S. laws and regulations, distributing or making available instructions or manuals for these products to purchasers and prospective buyers, and testing the Wi-Fi Direct Accused Products, and/or providing technical support or services for these products to these purchasers in the United States. *See, e.g.,* https://www.picoxr.com/global/support (providing "Pico Help," "FAQs," and "Product Support" for the Wi-Fi Direct Accused Products); https://www.picoxr.com/global/products/pico4 (advertising Pico 4); https://p16-platform-static-va.ibyteimg.com/tos-maliva-i-jo6vmmv194-us/ae723dcf5efe77849bb06a1cdd4ee77b.pdf (Pico 4 User Guide); https://www.picoxr.com/global/products/neo3-enterprise (advertising Pico Neo3). For example, ByteDance configures, designs, offers to sell, and sells the Wi-Fi Direct Accused Products and such Wi-Fi Direct Accused Products contain specific instructions, such as source code and configuration files, that cause such products to infringe the '028 Patent. For example, the instructions such as source code and configuration files of the Wi-Fi Direct Accused Products comprise a wireless communication device that infringes the '028 Patent.

186. In the alternative, on information and belief, since at least the above-mentioned date when ByteDance was on notice of its infringement, ByteDance has contributorily infringed, under 35 U.S.C. § 271(c), one or more claims of the '028 Patent. For example, ByteDance contributes to the direct infringement of such claims by distributors, customers, subsidiaries, importers, and/or consumers that use, import, purchase, or sell the Wi-Fi Direct Accused Products. To the extent

that the Wi-Fi Direct Accused Products do not directly infringe one or more claims of the '028 Patent, such products comprise components that are especially made and adapted for use in the Wi-Fi Direct Accused Products. Such components are specifically designed to comprise the infringing Wi-Fi Direct Accused Products and are a material part of the invention of the '028 Patent and are not a staple article of commerce suitable for substantial non-infringing use. For example, the Wi-Fi Direct Accused Products comprise a wireless communication circuitry, a component that is not generic and is especially made and specifically adapted to communicate with a wireless station using a non-authentication connection and authentication connection that infringe the '028 Patent. Further, the wireless communication circuitry is a core component that inherently infringes the '028 Patent and lacks any substantial non-infringing use.

***Damages***

187.    On information and belief, despite having knowledge of the '028 Patent and knowledge that it is directly and/or indirectly infringing one or more claims of the '028 Patent, ByteDance has nevertheless continued its infringing conduct and disregarded an objectively high likelihood of infringement. ByteDance's infringing activities relative to the '028 Patent have been, and continue to be, willful, wanton, malicious, in bad-faith, deliberate, consciously wrongful, flagrant, and an egregious case of misconduct beyond typical infringement such that Plaintiff is entitled under 35 U.S.C. § 284 to enhanced damages up to three times the amount found or assessed.

188.    Plaintiff has been damaged as a result of ByteDance's infringing conduct described in this Count. ByteDance is, thus, liable to Plaintiff in an amount that adequately compensates Plaintiff for ByteDance's infringements, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

## COUNT X

### (INFRINGEMENT OF U.S. PATENT NO. 12,225,599)

189.    Plaintiff incorporates the preceding paragraphs herein by reference.

190.    This cause of action arises under the patent laws of the United States, and, in particular, 35 U.S.C. §§ 271, *et seq*.

191.    Plaintiff is the owner of all substantial rights, title, and interest in and to the '599 Patent including the right to exclude others and to enforce, sue, and recover damages for past infringements.

192.    The '599 Patent is valid, enforceable, and was duly and legally issued by the United States Patent and Trademark Office on February 11, 2025, after full and fair examination.

193.    ByteDance has directly and/or indirectly infringed one or more claims of the '599 Patent in this District and elsewhere in Texas and the United States by making, offering to sell, selling, testing, using, and/or importing ByteDance products, their components and processes, and/or products containing the same that incorporate the fundamental technologies covered by the '599 Patent, including, but not limited to, the Wi-Fi Direct Accused Products.

***Direct Infringement (35 U.S.C. § 271(a))***

194.    ByteDance has directly infringed one or more claims of the '599 Patent in this District and elsewhere in Texas and the United States.

195.    ByteDance has directly infringed, either by itself or via its agent(s), at least claim 1 of the '599 Patent as set forth under 35 U.S.C. § 271(a) by making, offering to sell, selling, testing, and/or using the Wi-Fi Direct Accused Products.

196.     By way of illustration only, ByteDance, via the Wi-Fi Direct Accused Products, performs each and every element of claim 1 of the '599 Patent. To the extent the preamble is

limiting, the Wi-Fi Direct Accused Products perform "[a] wireless communication method." For example, each Wi-Fi Direct Accused Product supports Wi-Fi Direct, which connects a wireless communication device (one Wi-Fi Direct peer device) to a wireless station (another Wi-Fi Direct peer device).

### 1.4    Definitions

The following definitions and terms are used in this document:

**P2P Device**: Wi-Fi P2P device that is capable of acting as both a P2P Group Owner and a P2P Client.

**P2P Client**: A P2P Device that is connected to a P2P Group Owner.

**P2P Group Owner**: An "AP-like" entity, when not operating within DMG, or PCP, when operating within DMG, that may provide and use connectivity between Clients.

Source: Wi-Fi Peer-to-Peer (P2P) Technical Specification Version 1.7, at 14-15



Source: Wi-Fi Peer-to-Peer (P2P) Technical Specification Version 1.7, at 168

197.    The Wi-Fi Direct Accused Products communicate, via a wireless communication device, "with a wireless base station using a wireless communication connection having a non-authenticated component and an authenticated component, wherein the non-authenticated component of the connection does not contain an authentication procedure including a challenge and response between the wireless communication device and the wireless base station, and the authenticated component of the connection contains an authentication procedure including a challenge and response between the wireless communication device and the wireless base station." For example, the Wi-Fi Direct Accused Products communicate with a connection with another Wi-Fi Direct peer device using an authenticated connection component and a non-authenticated connection component.



Source: Wi-Fi Peer-to-Peer (P2P) Technical Specification Version 1.7, at 168

198. The Wi-Fi Direct Accused Products operate "under direction of control circuitry of the wireless communication device to receive from the wireless base station and via wireless communication circuitry (i) information necessary for the authenticated component of the connection during the non-authenticated component of the connection, (ii) content during the authenticated component of the connection, and (iii) additional information that is related to the content to be received during the authenticated component of the connection during the non-authenticated component of the connection." For example, the Wi-Fi Direct Accused Products operate under the direction of control circuitry (e.g., a Wi-Fi module processor) that controls the wireless communication circuitry. During an initial, non-authenticated component of the connection, the wireless communication circuitry receives information necessary for the authenticated component of the connection. In particular, the wireless communication circuitry receives information used to establish a subsequent authenticated connection. The wireless communication circuitry also receives additional information (e.g., Device Password ID Attribute) that is related to the content (e.g., password) to be received during the authenticated component of the connection. The Wi-Fi Direct Accused Products further cause the wireless communication circuitry to receive content from the wireless base station during the authenticated component of the connection.



Source: Wi-Fi Peer-to-Peer (P2P) Technical Specification Version 1.7, at 168

### 3.1.4.2  Group Owner Negotiation

Group Owner Negotiation is a three way frame exchange used to agree which P2P Device shall become P2P Group Owner and to agree on characteristics of the P2P Group, as illustrated in Figure 11. The details of those three frames are described in the following sections.

P2P Device                                                                    P2P Device

GO Negotiation Request
(The P2P IE includes P2P Capability, P2P Device Info, Group
Owner Intent, Configuration Timeout, Listen Channel, Extended Listen Timing,
Intended P2P Interface Address, Channel List, and Operating Channel attributes.
The WSC IE includes Device Password ID attribute)

GO Negotiation Response
(The P2P IE includes P2P Capability, P2P Device Info, Group
Owner Intent, Configuration Timeout, Intended P2P Interface Address,
Channel List, and Operating Channel attributes. The WSC IE includes Device Password ID attribute)

GO Negotiation Confirmation
(The P2P IE includes P2P Capability, Status, Channel List,
and Operating Channel attributes)

**Figure 11—Group Owner Negotiation message exchange**

Source: Wi-Fi Peer-to-Peer (P2P) Technical Specification Version 1.7, at 47

If a P2P Group Owner is transmitting the Invitation Request frame after NFC Static Handover, and intends to use the Device Password read from the NFC Tag in the subsequent WSC exchange, then it also shall include a WSC IE in its P2P Invitation Request and places the Device Password ID read from the NFC Tag in a Device Password ID attribute within the WSC IE.

Source: Wi-Fi Peer-to-Peer (P2P) Technical Specification Version 1.7, at 55-56

The WSC IE that is included in the GO Negotiation Response frame contains the Device Password ID and other attributes as shown in Table 65. The value of Device Password ID attribute shall be set to the specific configuration method that the P2P Device is currently using.

**Table 65—WSC IE in the GO Negotiation Response frame**

| Attribute | R/O | Allowed Values |
|-----------|-----|----------------|
| Version | R | 0x10 = version1.0, 0x11 = version 1.1, etc. |
| Device Password ID | R | The value of Device Password ID attribute shall be set to the specific configuration method that the P2P Device is currently using. See Section 12 (Data Element Definitions) of the WSC Specification [2]. |
| <other...> | O | Multiple attributes are permitted. |

Source: Wi-Fi Peer-to-Peer (P2P) Technical Specification Version 1.7, at 125

***Indirect Infringement (35 U.S.C. §§ 271(b), (c))***

199.    At a minimum, ByteDance has known of the '599 Patent at least as early as the filing date of this Original Complaint. In addition, ByteDance has known about the '599 Patent since at least July 3, 2025, when ByteDance received Plaintiff's correspondence via FedEx. Moreover, ByteDance has known of the '599 Patent and Plaintiff's theories of infringement prior to this Original Complaint being filed, as described in the foregoing. *Supra* ¶¶ 21-24.

200.    On information and belief, since at least the above-mentioned date when ByteDance was on notice of its infringement, ByteDance has actively induced, under 35 U.S.C. § 271(b), its distributors, customers, subsidiaries, importers, and/or consumers that import, purchase, or sell the Wi-Fi Direct Accused Products that include or are made using all of the limitations of one or more claims of the '599 Patent to directly infringe one or more claims of the '599 Patent (e.g., claim 1, as discussed above) by using, offering for sale, selling, and/or importing the Wi-Fi Direct Accused Products. Since at least the notice provided on the above-mentioned date, ByteDance does so with knowledge, or with willful blindness of the fact, that the induced acts

PLAINTIFF'S ORIGINAL COMPLAINT                    120

constitute infringement of the '599 Patent. ByteDance intends to cause, and has taken affirmative steps to induce infringement by its distributors, importers, customers, subsidiaries, and/or consumers by at least, inter alia, creating advertisements that promote the infringing use of the Wi-Fi Direct Accused Products, creating and/or maintaining established distribution channels for the Wi-Fi Direct Accused Products into and within the United States, manufacturing the Wi-Fi Direct Accused Products in conformity with U.S. laws and regulations, distributing or making available instructions or manuals for these products to purchasers and prospective buyers, and testing the Wi-Fi Direct Accused Products, and/or providing technical support or services for these products to these purchasers in the United States. *See, e.g.,* https://www.picoxr.com/global/support (providing "Pico Help," "FAQs," and "Product Support" for the Wi-Fi Direct Accused Products); https://www.picoxr.com/global/products/pico4 (advertising Pico 4); https://p16-platform-static-va.ibyteimg.com/tos-maliva-i-jo6vmmv194-us/ae723dcf5efe77849bb06a1cdd4ee77b.pdf (Pico 4 User Guide); https://www.picoxr.com/global/products/neo3-enterprise (advertising Pico Neo3). For example, ByteDance configures, designs, offers to sell, and sells the Wi-Fi Direct Accused Products and such Wi-Fi Direct Accused Products contain specific instructions, such as source code and configuration files, that cause such products to infringe the '599 Patent. For example, the instructions such as source code and configuration files of the Wi-Fi Direct Accused Products perform a wireless communication method that infringes the '599 Patent.

201.     In the alternative, on information and belief, since at least the above-mentioned date when ByteDance was on notice of its infringement, ByteDance has contributorily infringed, under 35 U.S.C. § 271(c), one or more claims of the '599 Patent. For example, ByteDance contributes to the direct infringement of such claims by distributors, customers, subsidiaries, importers, and/or consumers that use, import, purchase, or sell the Wi-Fi Direct Accused Products. To the extent

that the Wi-Fi Direct Accused Products do not directly infringe one or more claims of the '599 Patent, such products contain instructions, such as source code, that are especially adapted to cause the Wi-Fi Direct Accused Products to operate in an infringing manner. Such instructions are specifically designed to cause the Wi-Fi Direct Accused Products to perform in an infringing manner and are a material part of the invention of the '599 Patent and are not a staple article of commerce suitable for substantial non-infringing use. For example, the Wi-Fi Direct Accused Products implement a communication method that includes a connection having a non-authenticated component and an authenticated component, functionality that is not generic and is especially made and specifically adapted to perform the wireless communication method that infringes the '599 Patent. Further, the communication method that includes a connection having a non-authenticated component and an authenticated component in the Wi-Fi Direct Accused Products is a core functionality that inherently infringes the '599 Patent and lacks any substantial non-infringing use.

***Damages***

202.    On information and belief, despite having knowledge of the '599 Patent and knowledge that it is directly and/or indirectly infringing one or more claims of the '599 Patent, ByteDance has nevertheless continued its infringing conduct and disregarded an objectively high likelihood of infringement. ByteDance's infringing activities relative to the '599 Patent have been, and continue to be, willful, wanton, malicious, in bad-faith, deliberate, consciously wrongful, flagrant, and an egregious case of misconduct beyond typical infringement such that Plaintiff is entitled under 35 U.S.C. § 284 to enhanced damages up to three times the amount found or assessed.

203.    Plaintiff has been damaged as a result of ByteDance's infringing conduct described in this Count. ByteDance is, thus, liable to Plaintiff in an amount that adequately compensates Plaintiff for ByteDance's infringements, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

## CONCLUSION

204.    Plaintiff is entitled to recover from ByteDance the damages sustained by Plaintiff as a result of ByteDance's wrongful acts, and willful infringement, in an amount subject to proof at trial, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court.

205.    Plaintiff has incurred and will incur attorneys' fees, costs, and expenses in the prosecution of this action. The circumstances of this dispute may give rise to an exceptional case within the meaning of 35 U.S.C. § 285, and Plaintiff is entitled to recover its reasonable and necessary attorneys' fees, costs, and expenses.

## JURY DEMAND

206.    Plaintiff hereby requests a trial by jury pursuant to Rule 38 of the Federal Rules of Civil Procedure.

## PRAYER FOR RELIEF

207.    Plaintiff respectfully requests that the Court find in its favor and against ByteDance, and that the Court grant Plaintiff the following relief:

(i)    A judgment that ByteDance has infringed the Asserted Patents as alleged herein, directly and/or indirectly by way of inducing and contributing to the infringement of such patents;

(ii)    A judgment that ByteDance account for and pay to Plaintiff all damages and costs incurred by Plaintiff because of ByteDance's infringing activities and other conduct complained of herein, including an accounting for any sales or damages not presented at trial;

(iii)    A judgment and order requiring ByteDance to pay Plaintiff damages under 35 U.S.C. § 284, including up to treble damages as provided by 35 U.S.C. § 284, and any royalties determined to be appropriate;

(iv)    A judgment and order requiring ByteDance to pay Plaintiff pre-judgment and post-judgment interest on the damages awarded;

(v)    A judgment and order finding this to be an exceptional case and requiring ByteDance to pay the costs of this action (including all disbursements) and attorneys' fees as provided by 35 U.S.C. § 285; and

(vi)    Such other and further relief as the Court deems just and equitable.

Dated: May 13, 2026                          Respectfully submitted,

                                             */s/ Patrick J. Conroy*
                                             Patrick J. Conroy (Lead Counsel)
                                             Texas Bar No. 24012448
                                             Justin B. Kimble
                                             Texas Bar No. 24036909
                                             Jon Rastegar
                                             Texas Bar No. 24064043
                                             Brandon G. Moore
                                             Texas Bar No. 24082372
                                             **Nelson Bumgardner Conroy PC**
                                             2727 N. Harwood, Suite 250
                                             Dallas, Texas 75201
                                             Tel: (214) 446-4950
                                             pat@nelbum.com
                                             justin@nelbum.com
                                             jon@nelbum.com
                                             brandon@nelbum.com

                                             Janson H. Westmoreland
                                             Texas Bar No. 24131755
                                             **Nelson Bumgardner Conroy PC**
                                             3131 West 7th Street, Suite 300
                                             Fort Worth, Texas 76107
                                             Tel: (817) 377-9111
                                             janson@nelbum.com

                                             **Attorneys for Plaintiff Sovereign
                                             Peak Ventures, LLC**

PLAINTIFF'S ORIGINAL COMPLAINT          125